# JOHN BUCHHOLZ, et al., Respondents, v. STANDARD OIL CO., OF INDIANA, Appellants.

### In the Kansas City Court of Appeals, May 1, 1922.

1. **MASTER AND SERVANT:** Negligence: Agency, Question for Jury: One in Charge of Distribution and Delivery of Oil for Oil Company, Held Agent, for Whose Negligence the Company was Liable. Where evidence showed that one in charge of an oil station for an oil company made collections for gasoline and oil sold by him within a certain territory, was paid a commission therefor, had charge of distribution thereof in three counties and employed two truck drivers to work under his directions, and whose entire equipment and supplies, used in the sale, storage and delivery of gasoline and oil, except the chassis of his two 'trucks, the tanks upon same having oil company's name upon them, were furnished and owned by oil company, *held* there was ample evidence from which jury could find that he was the agent of the oil company which was liable for his negligence in causing a fire resulting in the death of the deceased.

2. **NUISANCE:** Storage of Imflammable Material: Mere Storage of Large Quantity of Gasoline or Other Inflammable Materials Does not Constitute a Nuisance Per Se. The storage of a large quantity of gasoline and other inflammable materials does not constitute a nuisance *per se*, and especially is not a nuisance under circumstances where there is no danger of ignition by extrinsic agencies and is reasonably isolated from a place where human beings frequent.

3. **MASTER AND SERVANT:** Nuisance: Independent Contractor: Owner of Oil Station so Maintained as to Constitute a Nuisance, in Charge of Independent Contractor, Held Liable to Third Persons Injured Thereby. Even if one in charge of an oil station maintained so as to constitute a nuisance, was an independent contractor, the defendant must be held to have knowledge of the way in which its business was conducted at its oil station and is liable to third persons injured thereby.

4. **EXPLOSIVES:** Nuisance: Negligence: Storage of Oil and Gasoline: Required to Use Very High Degree of Care: Use of Instrumentalities Which Throw off Sparks and Flames in Place Where Large Quantity of Gasoline was Stored, Held Gross Negligence Constituting a

Nuisance. To permit the use of instrumentalities such as automobiles which at times would throw off sparks and flames while being driven in and out of oil company's shed, containing large quantity of petroleum products and combustible materials, for purpose of having tanks on them filled, the floor of which was soaked with oil and gasoline, was gross negligence rendering company liable for maintenance of a nuisance causing injury by fire and explosion resulting therefrom, particularly in view of the very great degree of care it was required to exercise in handling such a highly dangerous agency which was stored in such large quantities in the vicinity of dwelling houses, streets, and other places where human beings were accustomed to be.

5. ———: ———: Negligence: Contributory Negligence: Proximate Cause: Evidence Held Insufficient to Show Deceased Guilty of Contributory Negligence as a Matter of Law or That Her Going to Place of Fire was Proximate Cause of Her Death. Where deceased, a girl sixteen years old, employed to take care of children, left the place of her employment in company with her employer, a woman of mature years, and her two children, and went to the scene of a fire in and about an oil station, and while standing about 325 feet away, and no nearer than others watching the fire, a large tank containing gasoline exploded, resulting in her death, she could have heard both warnings of danger and assurances of no danger, held that deceased was not guilty of contributory negligence as a matter of law, and it cannot be said that the going of deceased from her place of employment to the scene of the fire was the proximate cause of her death.

6. ———: ———: Pleading: Allegation that Defendant Negligently Permitted Flames of Fire from Motor Truck to Set Fire to Oils and Gasoline in Storage Shed, Held Sufficent to Submit Question of Whether Fire Causing Explosion Originated Thereby. Where petition, in addition to alleging defendant was maintaining a nuisance, specifically alleged defendant negligently caused and permitted sparks and flames of fire from a motor truck to come in contact with and set fire to oils and gasoline about and in storage tanks, whereby said tanks and contents thereof were set afire and caused to explode, held sufficient to warrant admission of evidence and submission to jury question of whether sparks and flames from motor truck came into contact with and set fire to said inflammable substances.

7. WRONGFUL DEATH: Action Arising Under Law of Foreign State: Instructions: Instruction on Damages for Death of Minor Occurring in the State of Kansas, Held not Erroneous. An instruction given in an action created by laws of the State of Kansas to recover damages for wrongful death of minor, is not erroneous in failing

Buchholz v. Standard Oil Co.

to limit the amount of compensation to be recovered for loss of minor's services to the period of the minority of deceased.

8. INSTRUCTION: Damages: Instruction on Measure of Damages for Death of Minor, Held not Contradictory in Itself nor Inconsistent with Another Instruction on Measure of Damages. An instruction that plaintiffs were entitled to the services of deceased until she should reach her majority, but that they should deduct from such sum "as you may believe she would have furnished plaintiffs, or either of them, during her life" and "such expenses as would be reasonable for her care," etc., *held* not contradictory in itself, nor inconsistent with another instruction on measure of damages.

9. ———: Statutory Practice of Foreign State: Instruction Predicated upon Statutory Practice of Another State, Held Properly Refused. In an action for wrongful death created by laws of foreign State, an instruction predicated upon the statutory practice of the state in which the cause of action accrued, *held* properly refused.

10. DEATH: Practice: In Action for Death, Created by Laws of Another State, Tried in Courts of This State, Local Practice Held Proper One to Follow. In an action for wrongful death, created by laws of another State, the local practice *held* controlling and proper one to follow.

11. APPEAL AND ERROR: Evidence: Harmless Error: Evidence of Absence of Safety Valve upon Gasoline Tank Which Exploded Where Absence Thereof was not Pleaded in Petition, Held Harmless Error in View of Testimony Showing There was Such a Valve upon Tank. In an action for death caused by explosion of gasoline tank, where petition did not allege negligence in reference to the absence of safety valve upon the tank, the admission of testimony that there was no such valve thereon, *held* harmless, if there was any error, in view of the fact that testimony finally showed that there was such a valve.

12. ———: ———: Admission of Evidence that Windows and Doors of Building in Which Gasoline and Oils were Stored, were Kept Closed Preventing Escape of Fumes, Held Harmless Where it Clearly Appeared That when Fire Started the Doors of the Building Were Open. Evidence of a witness that windows and doors of the building wherein gasoline and oils were stored, were kept closed and that the fumes from the gasoline and oil could not escape, there being no allegation of negligence in petition in reference thereto, *held* that admission thereof was harmless error in view of testimony of the witness that building was not a tight one, and where it clearly appeared from the evidence that when the fire started the doors of the building were open.

13. **EVIDENCE:** Practice: Objection to Question after Answer Thereto, Held Made too Late. Objection to testimony made after question answered was too late.

14. ———: Explosives: Evidence of Warnings of Danger, Held Properly Excluded Where it was not Shown That Person Injured was in a Position to Hear Them. In an action to recover damages for wrongful death of minor caused by explosion of gasoline tank during a fire, testimony of warnings of danger were properly excluded where it was shown that the deceased was not in a position to hear the same.

15. **DAMAGES:** Evidence: Evidence of Disposition and Industry of Deceased Minor, Held Admissible as Bearing upon Probable Value of Her Services to Her Parents. It was not error for plaintiffs to show the disposition of deceased towards children whom she was employed to nurse, and that she was industrious, as bearing upon probability of her services to her parents and as tending to show the nature and character of the service she was capable of performing and liklihood of her being able to retain employment.

16. ———: Excessive Verdict: Death: Verdict of $7000 for Death of 16 Year Old Girl, Held Excessive to Extent of $1000. Verdict of $7000 for death of daughter 16 years old, who was earning $5 per week and contributing the same to her parents who were of the ages of 46 and 45, *held* excessive to the extent of $1000.

Appeal from the Circuit Court of Daviess County.—*Hon. Arch B. Davis*, Judge.

AFFIRMED (*conditionally*).

*A. G. Knight, E. A. Rea* and *Kelly, Buchholz, Kimbrell & O'Donnell* for respondents.

*John H. Lucas* and *William C. Lucas*, for appellant.

BLAND, J.—This is an action for the wrongful death of plaintiffs' daughter brought under the statutes of Kansas. [Secs. 6014 and 6015, Kansas General Statutes, 1909.] These sections together with sections 2935, 2953, 2964 and 9037 of the Statutes of Kansas are pleaded in the petition. There was a verdict and judgment for plaintiffs in the sum of $7000 and defendant has appealed.

Buchholz v. Standard Oil Co.

The facts show that for a number of years prior to November 17, 1919, defendant maintained in the City of Hays, Kansas, a station, plant and equipment for the storage and distribution of gasoline and coal oil and the by-products of petroleum. The plant consisted of three large tanks placed side by side and three feet apart, each having a capacity from ten to fourteen thousand gallons; one of these tanks placed adjacent to and practically against a frame shed. In the north portion of this building were stored barrels and cases of lubricating oils and greases. The frame shed had a driveway running through it. The plant was upon ground owned by the Union Pacific Railway Company and its nearest point was about seven feet from the railroad tracks. Coal oil and gasoline were pumped from tank cars into the storage tanks by means of small gasoline engines operated inside of the frame building. The floor of the building was constructed of pine timber. For a period of fifteen years or longer gasoline and oil were spilled upon the floor. The floor had not been renewed or scrubbed but was swept up with charcoal. It had a discolored appearance and, of course, had been soaked with oil and grease. The gasoline and coal oil were distributed from this plant through two tank-bearing automobile trucks. Each had three compartments for gasoline and coal oil, each of these compartments had a capacity of -105 gallons. These trucks were driven into the frame building where coal oil and gasoline were pumped by hand into the proper receptacles. One of these trucks was stored in the building at night and in the early morning would be filled with gasoline and coal oil before it was removed from the building.

On the Thursday prior to the explosion causing the death of plaintiffs' daughter on Monday, John J. Love, local agent of the defendant, discovered a leak in one of the delivery tanks. This leak resulted from ordinary wear and tear upon the tank and was in the bottom of the tank where a lead pipe was screwed into it. Defendant's local agent Love had employed one Wehner to drive

one of the tank trucks and he called the latter's attention to this leak. Love and Wehner repaired the truck on Saturday and fixed a leak in the carburetor but for lack of.time did not repair the leak in the tank, but the compartment of the tank containing the leak was not thereafter used. On Monday morning Wehner started to fill his tank preparatory to starting out on his delivery route. He allowed the gasoline to overflow and to run over the sides of the tank and on to the floor. He then cranked the car.

There is evidence that the exhaust from the engine of this truck would spit fire at times. Wehner did not testify but the witness who saw what happened that morning stated that as he went to his place of business and within a few minutes after he passed the building he saw flames coming out of the drive-way door and that the truck "seemed to be all in flames." The whole frame building was soon on fire and shortly afterwards the tank being filled by Wehner exploded. County and city officers and many citizens assembled and attempted to extinguish the fire but were unable to make any headway and the flames soon spread to the large coal oil and gasoline storage tanks. The coal oil tank seemed to press apart at the riveted joints from which points the coal oil ran out in streams, catching fire and sending up great columns of smoke. There was testimony that there were as many as five explosions, the fifth being of the largest storage tank which held many thousand gallons of gasoline. When this tank exploded one end of it was shot southward across the railroad tracks and against a flour mill which was about 200 feet away, the other end, like a torpedo, went toward the north, traveling close enough to the ground to overturn telephone poles, iron posts and small trees which were in its course, and landed in the rear of a house which stood about 500 feet distant. It passed through a crowd of people who were watching the fire, killing a number of them, including plaintiffs' sixteen-year old daughter; eleven people were killed by the explosion and many others burned and injured.

It was about three hours from the time the fire started until the explosion of the huge gasoline tank. During that time a large percentage of the population of the town, a city of 3500 people, assembled to watch the conflagration, a great many of them taking part in fighting the fire. The fire was communicated to two small residences to the north and some small out-buildings. A grain elevator eighty feet away was burned as well as the flour mill. Defendant's plant stood one block distant from the business center of the town, four cottages were located seventy-five feet away, and there were six or seven residences in the same block separated from the plant by a dirt road. On at least three sides of the fire were gathered crowds of people. The county and city officers and others from time to time ordered the crowd back and warned them of the danger. It is apparent that deceased did not hear all of these warnings but there is evidence of such a nature as to convince us that she heard some of them. However, it seems that there were conflicting reports made to the crowd in reference to the danger; members of the crowd heard one of those in charge of the fire say at one time "there wont be any danger at all." The chief of the local fire department had threatened to arrest persons if they did not help to fight the fire. As already stated, there were four explosions prior to the explosion of the big gasoline tank which caused the death of the deceased.

Deceased lived with her parents in the City of Hays but was working as a servant in the house of one Miller, which was situated about 1200 or 1400 feet from the scene of the fire. Some time after the fire started she, together with her employer, Mrs. Miller, and the latter's two children, went to the fire and were standing about 325 feet away at the time of the explosion of the large tank.

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given; that defendant owed no duty toward deceased and that deceased was guilty of contributory negligence as a matter

of law; that her going from the Miller home, a place of safety, to a point near the fire which was dangerous, was the proximate cause of the injury. In this connection defendant contends that if there was any negligence, it was the act of a third person who did not stand in such relation to the defendant as to render the doctrine of *respondeat superior* applicable.

We think that there was ample evidence from which the jury could find that the acts of the local agent, Love, were the acts of the defendant and that such relation did obtain. The evidence shows that the general offices of the defendant were at Wichita, Kansas. Defendant appointed Love as district agent for three counties, which included the one in which Hays was the county seat. Love testified that he was the sub-agent of the Standard Oil Company at Hays. The evidence shows that Love was paid a commission of one and one-fourth cents per gallon on gasoline and coal oil sold inside the city limits of Hays and one and three-fourths cents for that sold outside the city. The chassis of the two motor trucks belonged to Love, which he had purchased second-hand, but the tanks upon the same belonged to the defendant and had defendant's name painted upon them. Defendant furnished all of the material, utensils and instruments used in the sale, storage and delivery of coal oil and gasoline and owned the building, tanks and improvements and their contents. In fact, with the exception of the chassis, the company owned everything, furnished its own stationery with its name printed thereon and kept the books and accounts of all money collected. Love sent all money collected to the office at Wichita and defendant would return to him his compensation. When the agent wanted a new bucket or funnel he had to get it from the defendant at Wichita. The company furnished ticket books on which memoranda of sales were made. These contained information as to the place and date of each sale, to whom sold, what kind of oil or gasoline, and the number of gallons purchased. In case payment of the gasoline and coal oil sold was not made in cash,

the agent received checks made payable to the Standard Oil Company. The defendant had a repair man which it would send around to keep the equipment in repair but the local agent had authority to make repairs himself such as the leak in the tank referred to, where it could be done easier and quicker than to send for the company's repair man. The agent employed Wehner and paid his wages out of his own funds.

The facts in relation to the agency in this case are not essentially different from those in the case of Magnolia Petroleum Co. v. Johnson, 233 S. W. 680 (Ark.), where it was held that both the agent and the assistant employed by him were the servants of the oil company. On the authority of that case we hold that there was ample evidence from which the jury could find that Love and Wehner were the servants of the defendant in this case and that defendant was liable for their acts of negligence. [See Tomlinson v. Marshall, 236 S. W. 680, 684, 685.]

We think that defendant was responsible for the death of deceased on another ground; that is, that she was killed as the direct result of the maintenance of a nuisance by defendant. As an explosive the danger from gasoline is ten times greater than that of gun powder. [O'Hara v. Nelson, 71 N. J. Equity, 161, 170.] Here was a huge quantity of highly explosive material stored above the ground in close proximity to dwelling houses and other buildings and within one block of the business center of a city of 3500 inhabitants. We cannot say that the mere storage of a large quantity of gasoline and other inflammable materials constitutes a nuisance *per se* under all circumstances. In fact, it has been held that the storage of gasoline is not a nuisance under circumstances where there is no danger of ignition by extrinsic agencies and is reasonably isolated from a place where human beings frequent. [Harper v. Standard Oil Co., 78 Mo. App. 338.]

But the situation here is not like that in the Harper case. Conceding for the purpose of this point that Love was an independent contractor, defendant must be

held to have had knowledge of the way in which the business of the company was conducted at its plant. For several years the frame building had been used in the manner in which it was used on the day of the fire. Automobile trucks propelled by internal combustion engines were being constantly driven in and out of the shed for the purpose of having the tanks on them filled; in this building was contained a large quantity of combustible material and the floor was soaked with oils. The truck being used by Wehner at the time the fire was started had been purchased from a former agent, Poffenberger; Love had been agent for four or five months prior to the fire and had used this truck all of this time. Defendant had a representative who lived in Hays and who knew how the business was being conducted. To permit the use of instrumentalities such as the automobile which at times would throw off sparks and flames, was gross negligence on the part of the defendant in view of the very great degree of care it was required to exercise in handling this highly dangerous agency that was stored in such large quantities in the vicinity of dwelling housses, streets and other places where human beings were constantly found. That defendant was maintaining a nuisance we think is beyond question. [O'Hara v. Nelson, supra; State ex rel. v. Excelsior Powder Mfg. Co., 259 Mo. 254; Whittemore v. Baxter Laundry Co., 181 Mich. 565; Hendrickson v. Standard Oil Co., 126 Md. 577, 587; McGuffey v. Pierce-Fordyce Oil Ass'n., 211 S. W. 335 (Texas)].

In Holman v. Clark, 272 Mo. 266, 275, 276, the Supreme Court said—

" 'In determining the question (whether or not a nuisance) the locality, the quantity and manner of keeping will all be considered, as well also as the nature of the explosive and its liability to accidental explosion.' [1 Wood on Nuisances, sec. 140.] In some cases, negligence of a character to make that a nuisance which otherwise

would be lawful may appear in the attending circum-stances; therefore, after an explosion, when deciding whether or not a public nuisance existed in connection with the storage of the material which exploded, the question of the manner in which it was kept—whether negligently or otherwise—may enter into the consider-ation; but when it is once determined upon sufficient evidence that such a nuisance was maintained, then no particular causal act of negligence directly contributing to the explosion need be shown; it is sufficient to prove facts which justify the finding of a public nuisance, and when the explosion is a thing that could naturally flow therefrom, then, since that possibility is one of the very elements which go to make up the nuisance, in the ab-sence of testimony to the contrary, the explosion will be assumed to have followed as a result thereof. If the 'place and manner of keeping the quantity and kind of dynamite here involved, considering its liability to explode (according to the facts in that particular as the jury may find them), created a danger beyond that which *ex necessitate* always attaches to the lawful possession of such a material, and that this danger amounted to a menace to life and property in the neighborhood, then they properly could determine that the defendants had maintained a public nuisance which resulted in the de-struction of plaintiff's building, and bring in their ver-dict accordingly, even though no particular act of neg-ligence directly responsible for the explosion were shown.' [Forster v. Rogers Bros., 247 Pa. l. c. 59, 60.]''

We do not think that the deceased was guilty of con-tributory negligence as a matter of law. It may be con-ceded that if there was nothing in the case on this point except the mere fact that deceased was warned of the danger of standing near the burning tanks, the point would be well taken. However, this is not all of the facts that bear upon the subject. The record discloses that there were conflicting statements made in reference to the danger. There had been four explosions prior to the explosion of the large gasoline tank and it was

reasonable to suppose in view of the fact that there were only three tanks that all of them had exploded. [Amer. Glycerine Co. v. Hill, 255 Fed. 841.] It will be remembered that deceased was only sixteen years of age; that she was in the company of her employer, a woman of mature years who attended the fire herself taking along her two small children and stood no further away from the fire than deceased. Deceased was in her employ and her duties were largely those of looking after the children and it would be expected that deceased in view of her immature years would rely somewhat upon her employer's judgment under the circumstances. Aside from this, a large crowd of adult people were gathered and many of them stood closer to the fire than deceased. Under the circumstances we do not believe that deceased should be convicted of contributory negligence as a matter of law. The case of Cleveland, C. C. & St. L. Ry. Co. v. Ballentine, 84 Fed. 935, and like cases cited by defendant are not in point. There the injured person, without any invitation and without legal right, went upon the property of a railroad company after the fire had started. It is apparent that we cannot say as a matter of law that the going of deceased from the Miller home to the scene of the conflagration was the proximate cause of her death.

Complaint is made of plaintiffs' instruction No. 1. It is insisted that "the petition charges that defendant sold and delivered the contents of the tank to customers, using for delivery purposes a tank-bearing motor truck" and that "the instruction authorized a recovery if defendant *permitted* a motor truck to be used;" that the evidence is conclusive that the truck was Love's and that the defendant did not know of the defective condition thereof. From what we have said there is no merit in this contention. It is insisted that there is no allegation in the petition that sparks and flames from the motor truck came into contact with and set fire to the inflammable substances in the store room, and there is no evidence to that effect but that those facts were

submitted to the jury. The petition in addition to alleging that defendant was maintaining a nuisance, specifically alleges that defendant "carelessly and negligently caused and permitted sparks and flames of fire from said motor truck to come in contact with and set fire to said oils and gasoline about and in said tanks whereby said tanks and the contents thereof were by the defendant's carelessness and negligence set afire and caused to explode." The jury could infer from the evidence that fire from the motor truck ignited the combustible materials in the storage room. The instruction submits to the jury the question that if "defendant caused or permitted the said motor truck to be used in said premises and that sparks or flames were emitted therefrom," etc. It is insisted that this instruction authorized the jury to find for plaintiff if any of defendant's "customers, with or without its knowledge in relation thereto," permitted sparks and flames to be emitted from the motor truck. The instruction confines the attention of the jury to the motor truck that caught on fire in this case. There was evidence that this truck was being used by Wehner and that Wehner was a servant of the defendant. The instruction was worded in such a way as to be broad enough to permit a recovery for plaintiffs even though Love and Wehner were not defendant's agents but that Love was an independent contractor. However, the undisputed evidence in this case shows that defendant was maintaining a nuisance and that deceased was killed as a direct result thereof. We find no error in the instruction.

Complaint is made of plaintiffs' instruction No. 3 and the court's instruction No. 9. The attack on instruction No. 3 is that it does not limit the compensation to the period of the minority of the deceased. Under the laws of Kansas the instruction is not erroneous for failing so to do. [Stipetich v. Security Stove & Mfg. Co., 218 S. W. 964; A. T. & S. F. Ry. Co. v. Cross, 58 Kans. 424.] It is insisted that the court's instruction No. 9 is contradictory in itself in that "it attempts to

limit the service of the deceased to her parents until she should reach her majority, but authorizes a recovery of any sum that she would have furnished the plaintiffs, or either of them, during her life. One is contradictory of the other and neither of the same is supported by the evidence." The instruction is a modification of the one offered by defendant in which defendant sought to limit the recovery of the compensation to the period of the deceased's minority. The instruction as given tells the jury that plaintiffs were entitled to the services of the deceased until she should reach her majority but that they should deduct from such sum "as you may believe she would have furnished plaintiffs or either of them during her life," "such expenses as would be reasonable for her care, comfort, education, board, clothing and necessary expenses." There is nothing inconsistent between plaintiffs' instruction No. 3 and the court's instruction No. 9, nor in the court's instruction No. 9 within itself. There is ample evidence to support it.

The court properly refused defendant's instruction No. 1, which was predicated upon the practice in the State of Kansas and was a request to require the jury to answer the questions contained therein. There is no evidence of the laws of Kansas in relation to this matter, and, aside from this, the Missouri practice was the proper one to follow in a trial of this case. The court properly refused defendant's instruction No. 9 because it attempted to confine plaintiffs' compensation to the minority of the deceased. Defendant's instruction No. 13, in the two last lines thereof, is a peremptory instruction to find for the defendant.

Complaint is made of the action of the trial court in the reception and rejection of evidence. It is insisted that the court erred in permitting evidence as to the absence of a safety valve upon the large gasoline tank that exploded, resulting in the death of deceased. It is true that the witness on direct examination stated that he did not think there was a safety appliance upon the tank but later he testified that there was a safety valve, and in connection with the witness's testimony defend-

ant introduced in evidence a safety valve similar to the one upon this tank, together with a lengthy explanation in reference to its use. There is no negligence alleged in the petition in reference to the absence of a safety valve upon the tank. We think under the circumstances, in view of the fact that the witness finally testified that there was such a valve, that if there was any error at all in regard to the matter, it was entirely harmless.

Complaint is made that the court permitted plaintiffs to show that the windows and doors of the building wherein the oils were stored were kept closed and that fumes from gasoline and oil could not escape. It is insisted that there is no allegation of negligence in reference to such a matter. This witness also testified that the building was not a tight one and that the large tanks were not within the enclosure but without. The evidence shows that when the fire started the doors of the building were open. Nothing in regard to such negligence, if any, was submitted to the jury and if there was any error in connection with the matter, it was harmless. The objection to testimony that Wehner stated, "My God, it's too bad this happened" came after the question was answered and it was, therefore, too late.

The court did not err in excluding testimony of warnings where it was not shown that deceased was in a position to hear the same. Complaint is made of the following—

"Q. Is he (Carroll) connected with the Standard Oil Company? A. I don't know.

"Q. Or with Mr. John H. Lucas' office? A. I couldn't say; I don't know.

"Q. He issues out the pay checks?

"By Mr. Black: Objected to as incompetent, irrelevant and immaterial.

By the Court: Overruled.

To which action and ruling of the court the defendant, by counsel, then and there duly excepted at the time and still excepts.

A.  I suppose he pays some of the bills.

"Q.  You know he does, don't you?  A.  Yes; he bought the transportation."

This is all there is in the record of the trial in relation to the matter.  There is nothing in the abstract of the record to indicate what matter was being brought out from that part of it abstracted by the defendant. (Very little of the evidence is abstracted *verbatim* but mostly in narrative form and much omitted entirely.) It is impossible to say what was attempted to be brought before the jury.

It was not error for plaintiffs to show the disposition of the deceased towards the children whom she was employed to nurse, whether this was kindly or otherwise, as tending to show the nature and character of the service she was capable of performing and the likelihood of her being able to retain employment.  It was not error to allow plaintiffs to show that she was industrious, whether by her conduct in her home or by other means.

Nothing is stated in the brief going to show why the court should not have rejected defendant's offer in evidence of the petition and bond for removal to the Federal Court and the restraining order of the district court of Ellis County, Kansas.  What purpose could be served in having the jury know of these things, we are not able to see.  The statutes of Kansas pleaded in the petition were introduced in evidence and read to the court without the presence of the jury.  We find no merit in the other points in reference to the admission and exclusion of evidence.

It is insisted that the verdict is excessive.  In reference to this point the facts show that deceased was earning $5 per week, which she turned over to her parents.  She was industrious, intelligent, and kind to her parents.  There is no evidence of the circumstances in life of plaintiffs but the jury saw them and was able to judge somewhat of their circumstances.  Deceased was contributing to them at the rate of $260 a year.  It

would be natural to assume that her earnings would increase as she grew older and from the disposition which she manifested toward her parents, that she would continue to contribute to their support after she became of age.  Of course, it is probable that she would have married and might have discontinued her contributions.  At the time of the trial, which was during the month of August, 1920, and less than a year after the death of deceased, deceased's mother was forty-six years of age and her father forty-five.  The mother had an expectancy of a little over twenty-three years and the father about twenty-four and a half years.  Under the holding of the Supreme Court of Kansas in the cases of Aaron v. Telephone Co., 89 Kans. 186, Denver v. Railroad Company, 96 Kans. 154, and Improvement Co. v. Buzzard, 69 Kansas, 330, construing the death statute of Kansas, and which decisions are very persuasive upon us in this case, we think that the verdict is excessive to the extent of $1000.  If, therefore, plaintiffs will within ten days remit from the judgment the sum of $1000, the judgment will be affirmed, otherwise it will be reversed and the cause remanded.  All concur.