WESLEY BECKER v. GEORGE W. ASCHEN, JR., and STANDARD OIL COMPANY, a Corporation, Appellants.—131 S. W. (2d) 533.

Division One, July 7, 1939.

*R. E. Blodgett* for George W. Aschen, Jr.

*Nagel, Kirby, Orrick & Shepley* and *Everett Paul Griffin* for Standard Oil Company.

*Albert T. Sauer* and *Moser, Marsalek & Dearing* for respondent.

DALTON, C.—This is an action for damages for personal injuries sustained by plaintiff while getting down from an automobile greasing and drain rack. The Standard Oil Company (hereinafter referred to as Oil Company) and the operator of one of its service stations were made defendants. The jury returned a verdict for $11,000 against both defendants. Defendants appealed separately from the judgment but the appeals have been consolidated here.

The amended petition upon which the cause was tried charged that defendant Aschen and defendant Oil Company were operating

an oil and gasoline filling station in St. Louis; that plaintiff was an invitee of defendants for the purpose of having the oil in the crankcase of his automobile changed; that at the direction of defendants he drove his car onto a stationary grease rack; and that while attempting to alight from his car by means of a step on the grease rack, he was caused to slip and fall, receiving injuries. Defendants complain, first, of the court's failure to give instructions in the nature of demurrers to the evidence offered at the close of plaintiff's case and at the close of all the evidence, second, of the giving of plaintiff's Instruction No. 1, and third, of the verdict of the jury as grossly excessive.

The question presented by defendants' request for directed verdicts is whether, admitting the truth of all the evidence given in favor of plaintiff, together with such inferences as may reasonably be drawn from it, there is enough evidence to sustain a verdict for plaintiff against defendants. In determining whether plaintiff made a submissible case for the purpose of ruling on defendants' peremptory instructions the court must consider the evidence and all inferences fairly deducible therefrom in a light most favorable to plaintiff, but defendants' evidence showing facts contrary to plaintiff's evidence and all unfavorable inferences must be rejected. [Willhauck v. Chi., R. I. & Pac. Ry. Co., 332 Mo. 1165, 61 S. W. (2d) 336, 338; Gerber v. Kansas City, 304 Mo. 157, 263 S. W. 432, 436.] The determination of all issues of fact are for the jury. [Parrent v. Mobile & O. Ry. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, 1073.] If supported by substantial evidence the verdict and finding of the jury is conclusive and binding upon this court. [Rexford v. Philippi, 337 Mo. 389, 84 S. W. (2d) 628, 630.]

The charge of negligence is that plaintiff's ". . . injuries were directly caused by the negligence and carelessness of the defendants in this: that defendants negligently and carelessly caused and permitted *oil to be and remain on said step,* when defendants knew, or in the exercise of ordinary care would have known, that the presence of such oil on said step would be likely to cause plaintiff or others using said step to slip, fall and be injured; that defendants negligently failed to remove said oil from said step, and that they negligently failed to warn plaintiff of the presence of said oil on said step.'' Defendants' answers were general denials coupled with a plea of contributory negligence.

The evidence tended to show that on the date of the accident the plaintiff, who was the owner of a Dodge automobile, was driving east on the south side of Delmar Avenue and turned south into a certain filling station at 5738 Delmar to get an oil drain. It was a winter afternoon near 5 P. M. and about dusk. Some of the lights at the station were on at the time plaintiff drove in. At 5740 Delmar, the premises adjacent to the service station, the defendant Aschen operated an Auto Laundry. One of the two entrances to the filling

station was across the front of the Auto Laundry premises. The two premises were not separated. Customers at the filling station either came or left across a part of the entrance to the auto laundry premises, a circular drive extending through both premises and passing the filling station pumps.

Plaintiff drove to a hydraulic lift on the Auto Laundry premises, where he was told by the filling station attendant (Raymond Aschen) that the lift was out of order. The attendant advised plaintiff that he could use an adjacent metal grease rack, which was pointed out. This rack was wholly on the oil station premises, but the approach was from the opposite direction and over a part of the Auto Laundry premises. Plaintiff turned his car to approach this rack, requesting the said attendant to direct him in order that he not miss the runways. The attendant stood in front and guided and directed plaintiff up the runways and onto the rack, and then moved to the left side of the rack, and raised the hood of plaintiff's car. This grease rack was some fifteen feet in length and three feet high. A ten inch board or step extended the length of the rack on each side. These steps or boards were provided for use of customers to get in and out of automobiles on the rack and were used by employees in connection with servicing automobiles. When an automobile was on the rack these steps or boards were about half way between the running board of the car and the ground.

After plaintiff had driven his car onto the rack he proceeded to get out. It was cold and he wanted to go into the filling station to warm. He slid over to the right hand side of the seat, as it was his custom to get out on the curb side. He opened the door and put both feet out on the running board, facing out. The running board was about seven inches below the floor of his car and the seat of the car some eight inches above the floor. He then put his left hand on the front newel post of the car body, put his right foot out and down to the board or step on the side of the rack. In putting his foot down on the board or step he was in the act of getting out of the car. The board or step extended out from the running board of the car a sufficient distance to make it appear to be a direct step in demounting from the car. Plaintiff looked down at the step but only to see where he was stepping, that is, to see where he was putting his foot. He did not see any oil or grease soaked condition of the board—only the general dark appearance. He could not see any grease or oil on the step when he looked, but as he put his weight on this step his foot slipped out from under him, slipping from right to left. He put out his right arm to break the fall, and the entire weight of his body came down on his arm as he struck the ground, and the arm was broken.

Defendants contend that, plaintiff was guilty of contributory negligence as a matter of law in the manner in which he got out of the

automobile, and in not making certain that the step was safe, and in not facing the car and holding on as he got out of the car. We think the issue of contributory negligence was for the jury. Plaintiff did not know of the presence of oil on the step. There was no reason to expect danger. The condition of the step was not obvious to him. He could assume that defendants had discharged their duty. The action and conduct of plaintiff as he proceeded to leave the car was not so glaringly dangerous as to threaten peril. Under the circumstances shown by the evidence we cannot say that as a matter of law plaintiff failed to act as an ordinarily prudent person. "Where the danger is not so obvious that a person should have seen it in the exercise of ordinary care, failure to discover it is not negligence." [State ex rel. v. Haid, 330 Mo. 959, 51 S. W. (2d) 1015, 1017.] "Negligence does not become a question of law alone, unless the acts constituting it are of such a character that all reasonable men would concur in pronouncing them so." [Wilson v. Wells, 321 Mo. 929, 13 S. W. (2d) 541, 544.]

After being injured plaintiff got up, went to the station house and then turned back to get a glove he had dropped in the fall. As he did so, he looked at the board to see what had caused his fall and observed a mark six to eight inches long where his foot had slipped on the board. The board was very much oil soaked, oil saturated, stained and very slippery. There was a little pool of fresh oil to the north of where his foot had slipped but he did not slip in the fresh oil. On cross-examination plaintiff was asked whether or not in a previous trial he had stated "It was slippery and there was evidence of fresh oil and the part where I slipped showing in fresh oil; my mark showing in the fresh oil which was on the other part of the board." Plaintiff answered, "If I did I don't recall it" and on further cross-examination as to whether his mark showed in this fresh oil plaintiff answered, "I don't know exactly. I was rather in bad shape that night. I don't know how the mark was." Defendant Oil Company then offered said prior statements in evidence.

■ Defendant Oil Company contends that the evidence concerning the oil soaked, oil saturated and very slippery condition of the step should not be considered because not pleaded, and that the allegation of the petition *as to the presence of oil on the step* was wholly unsupported by any evidence in the record. We hold that the evidence heretofore set out was sufficient to support the allegation of the petition as to the presence of oil on the said step. In addition to the direct testimony of plaintiff and the inferences which a jury could properly draw from the facts in evidence, the defendants offered plaintiff's testimony at a previous trial as to the marks, where plaintiff slipped, showing "in fresh oil on the step." Under the circumstances shown by the record this testimony was not necessarily wholly contradictory. All conflicts were for the consideration of the jury.

The testimony as to the oil soaked and oil saturated condition of the step was offered and received in evidence as if in support of the said allegations of the petition and without objection on the part of defendants. The contention is without merit.

Defendant Oil Company contends (1) that there is no evidence that defendant Aschen was the agent of the Oil Company in the operation of the station and particularly in the operation of this grease rack; and (2) that there is no evidence that defendant Aschen, in the transaction with plaintiff in the draining of plaintiff's car, was acting within the scope of his agency for defendant Oil Company. This contention is primarily based upon defendant Oil Company's evidence that it exercised no control over the station or its employees or over the said grease rack which was owned by defendant Aschen, and upon testimony (contradicted by plaintiff) that plaintiff asked for Kendall oil, but which oil was not a Standard Oil Company product or owned by defendant Oil Company.

Plaintiff at the time of his injury had not ordered any particular brand of oil. He wanted "a good oil drain." Brands of oil, other than those of defendant Oil Company, were advertised and sold on the premises with the knowledge of defendant Oil Company. These other oils were stored on the adjacent premises and were owned and sold by Aschen. The availability of different brands of oil was considered an indirect stimulus to the sale of gasoline on the oil station premises.

Defendant Oil Company owned the filling station building, the pumps, the signs, the air standards, air compressor, underground tanks, and other equipment on the premises, including a drain rack which defendant Aschen had moved to the rear of the lot and replaced by the better rack in question here. Defendant Aschen had leased the oil station premises to the defendant Oil Company and received back from the company an authorized agent's agreement. He was operating the station under the terms of the lease and authorized agent's agreement. The lease recited that Oil Company was the owner of the improvements and equipment. Rental was based on the quantity of gasoline and motor oils sold by the lessee through the station on the premises. The Oil Company reserved the right to terminate the lease without cause on 10 days' notice of its intention so to do. The authorized agent's agreement was executed by defendant Oil Company and defendant Aschen. In the agreement Aschen was referred to as "authorized agent for the company" at the said service station for the sale of gasoline and motor oils. Defendant Aschen was required to give his exclusive time and attention to said employment (except as therein specified) and to operate said service station in compliance with the rules and regulations of the company, and in a manner satisfactory to it. The agreement required the agent to sell gasoline and motor oils for cash for the

account of the company, at prices established by it, the company to supply the gasoline and motor oils, and the agent to pay when the supply of each product was replenished, less earned commissions. The agent could extend credit for gasoline sold to persons whose names were approved for credit and furnished him in writing by the company but otherwise he was personally responsible for payment in cash. The sale of automobile accessories on the premises was authorized, but not to interfere with the sale of company products or with agent's duties under the agreement while in the company's employment. The agreement fixed the commissions to be paid the agent and provided the agreement might be canceled by either party on 24 hours' written notice. The lease and agreement were prepared by the Oil Company and executed at its general offices, and were in force and effect on the date of the accident.

A sign on the filling station building bore the words, "Filling Station—Standard Oil Company." Above this sign were the words "Aschen's Service Station." On the premises was a portable sign advertising Iso-Vis, a Standard Oil product. Over the sidewalk was suspended a large circular sign bearing the words "Standard Oil Company," with the Oil Company's "Red Crown" insignia in the middle. The filling station attendants wore "Standard Oil Company" uniforms in connection with their work. The station was similar in appearance to Standard Oil Company filling stations.

The tanks were full of gasoline belonging to the Oil Company when Aschen entered the premises under the agreement. When any part of it was sold Aschen owed the Oil Company for it. The gasoline remaining in the tanks was always the property of Oil Company. The gasoline sold was not owned by Aschen but by the Oil Company, Aschen was selling it on consignment. When the tanks were refilled Aschen paid for the amount he had sold, less his commissions. Credit was extended to persons holding Standard Oil Company credit cards in connection with the sale of its products on the premises. These charges were turned over to defendant Oil Company who made the collections. Gasoline was delivered regularly to the station by defendant Oil Company trucks, and if there was room in the tanks for gasoline Aschen had to accept it. Representatives of defendant Oil Company visited the premises from time to time at their own convenience. Defendant Aschen selected and paid the employees, including the one that waited on plaintiff. In addition he paid the city license and the light and coal bills and other expenses of the station. There was, of course, much additional, conflicting and contradictory testimony to that heretofore set out.

In support of its position that defendant Aschen was not the agent of the defendant Oil Company in the operation of the station and grease rack and in support of its contention that Aschen in dealing with plaintiff was not acting within the scope of his agency, if any,

appellant cites: T. J. Moss Tie Co. v. Stamp (Mo. App.), 25 S. W. (2d) 138, 141; Gibson v. Texas Prudential Insurance Co., 229 Mo. App. 867, 86 S. W. (2d) 400; Citizens Trust Co. v. Tindle (Mo. App.), 194 S. W. 1066. The rule announced in these cases does not apply to the facts at hand. There was evidence that the injury here happened by reason of the dangerous and unsafe condition of an instrumentality maintained and used by the defendants for the benefit of both in connection with said filling station.

Without setting out in further detail the facts and circumstances shown in evidence we hold that the above issues were properly submitted to the jury. The jury was warranted in finding that defendant Oil Company operated the filling station and that defendant Aschen was its agent, servant and employee. There was substantial evidence that defendant Oil Company reserved to itself the right to control and did control the operation of the filling station business. The fact that defendant Aschen's remuneration was on a commission basis did not alter the situation. [Greene v. Spinning (Mo. App.), 48 S. W. (2d) 51, 56; Heisey v. Tide Water Oil Co. (Mo. App.), 92 S. W. (2d) 922, 928; Garnant v. Shell Petroleum Corp., 228 Mo. App. 256, 65 S. W. (2d) 1052; Coffman v. Shell Petroleum Corp., 228 Mo. App. 727, 71 S. W. (2d) 97, 104; Cholet v. Phillips Petroleum Corp. (Mo. App.), 71 S. W. (2d) 799; Buchholz v. Standard Oil Co., 211 Mo. App. 397, 244 S. W. 973; Gulf Refining Co. v. Brown, 93 Fed. (2d) 870, 116 A. L. R. 449.]

There is no contention that defendant Aschen was operating the filling station as an independent contractor for defendant Oil Company, and could not be under the above authorities. Defendant Oil Company contends that it did not operate the filling station but that the station was operated exclusively by defendant Aschen under "purely a sales agreement" with defendant Oil Company. The issue of defendant Oil Company's operation of the station was for the jury.

As a further reason for sustaining the demurrers to the evidence defendants insist that there was no evidence of negligence on the part of either defendant.

The general rule is that the owner or possessor of premises is liable to an invitee, using due care, for an injury occasioned the invitee by an unsafe condition of the premises which is actually or constructively known to the owner or possessor of the property but not to the invitee, and which the owner or possessor of the property has negligently suffered to exist but of which the invitee has no knowledge or notice. [Ilgenfritz v. Mo. Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723; Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278; Hubenschmidt v. S. S. Kresge Co. (Mo. App.), 115 S. W. (2d) 211, 213; Asbury v. Fidelity National Bank & Trust Co., 231 Mo. App. 437, 100 S. W. (2d) 946, 949.]

The case of Ilgenfritz v. Mo. Power & Light Co., supra, at page 726, states the rule as follows: "An owner or occupant of lands or buildings who directly or by implication invites others to go thereon, of course, owes such persons the duty to exercise ordinary care to have the premises in a reasonably safe condition."

Defendants contend that there was no evidence that there was oil on the step, or that defendant had notice that a dangerous condition existed, or that it had existed for any length of time, and that nobody had slipped before on the rack. Defendants rely on cases dealing with persons who fell on property oiled or waxed floors, and cases where persons who fell by reason of the condition of floors, which condition was not shown to have been known to or could have been expected by the owner or occupant. Defendants cite and rely on Achter v. Sears, Roebuck & Co. (Mo. App.), 105 S. W. (2d) 959; Ilgenfritz v. Mo. Power & Light Co., supra, and other cases therein cited. In our opinion said cases are not decisive here.

We have reviewed the evidence in this case and from that evidence the sufficiency of plaintiff's case must be determined. The rack involved here was used by defendants in draining and refilling crankcases and for oiling and greasing automobiles. In such use oil and grease would get on various parts of the rack and steps. Defendants knew and recognized such facts and claim to have had the rack cleaned and the steps washed with gasoline each morning. If more frequent attention was required to make the steps reasonably safe, that duty rested upon defendants. Grease and oil on the steps were discoverable by reasonable inspection and the duty to discover their presence rested upon defendants. The oil soaked and oil saturated condition of the board was evidence that the condition had existed for sometime. That grease and oil on the steps would produce a dangerous and unsafe condition is common knowledge. Such a step with grease and oil on it, cannot reasonably be compared with properly oiled or waxed floors or marble or stone stairs. There was evidence that plaintiff was lawfully upon the filling station premises and upon said grease rack, as an invitee of defendants at the time and place he was injured. Defendants owed him the duty of exercising ordinary care to see that said premises, including the step on said grease rack provided for the use of plaintiff and other customers was in a reasonably safe condition. We hold that the issue of defendants' negligence under the facts and circumstances in this record was for the jury.

Defendants complained of plaintiff's Instruction 1. This is a long instruction and it is unnecessary to set it out here. Defendants contend that it follows the petition rather than the evidence, in that it submits the question as to the existence of oil on the step, when the evidence showed an oil soaked, oil saturated condition. We have previously disposed of this contention. Defendants complain

that the instruction fails to submit "in its hypothesis that plaintiff saw the board," and that its condition was as obvious to plaintiff as it was to defendants. On plaintiff's testimony it was not obvious. Defendants complained that the instruction submits the correctness of plaintiff's evidence on certain matters rather than defendants' evidence. For example, defendants contend plaintiff first went to 5740 Delmar to get Kendall oil, while plaintiff testified he went to 5738 Delmar, to get an oil drain and had not specified the oil. The instruction could properly submit plaintiff's evidence to the exclusion of defendants' evidence. Defendants complain that the instruction does not refer to the ownership of the rack by defendant Aschen or to the fact that defendant Aschen selected the employee, Raymond Aschen. These matters were immaterial since the question of control was the matter in issue. Defendants also complain of the instruction in other particulars. In our opinion the instruction correctly declared the law and is not subject to the criticism leveled against it.

Defendants complain that the verdict is grossly excessive and say that $10,000 is the usual maximum of recovery permitted for the total loss of an arm. Plaintiff was forty-one years of age. He was assistant secretary and treasurer of the Mercantile Insurance Agency, a general insurance agency writing all kinds of insurance. His income was derived from insurance commissions earned by him. No request was made for recovery of loss of earning and none was allowed, although defendant on cross-examination of plaintiff developed that plaintiff suffered a decided loss in premium income on account of policyholders who did not renew their policies.

Plaintiff fell on his right elbow causing a complete dislocation of the bones of the forearm. The ulna and radius were totally separated from the humerus. There were comminuted fractures or shattering of the bones. The head of the radius was completely broken off and was in a false position. It could not be restored, would not heal, and had to be taken out. Plaintiff was first taken to St. Luke's hospital, where he remained two days. X-ray pictures were taken and the arm placed in a plaster paris cast. He then returned to his home for two weeks. After the swelling subsided, he returned to the hospital where an operation was performed and the head of the radius and many fragments of bones were removed. It was necessary to place plaintiff under an anaesthetic. At the conclusion of the operation the wound was sewed up and later plaintiff's arm was again placed in a plaster paris cast and he was removed to his home. The arm remained in a cast for more than three months and plaintiff received treatment from a specialist for some four months. At the time of the trial he was still receiving treatment from his family physician. The arm was being treated with the infra-red and electric diathermy and massaging. These treatments tended to prevent continued

ankylosis or stiffening of the joints and the further atrophying of the muscles. Because of the severity of plaintiff's injuries it was necessary for plaintiff's arm to be set at a ninety degree angle at the elbow. At the time of the trial there was some four to ten per cent motion at the elbow, which resulted in a movement of approximately two inches, up and down, at the wrist. The motions of the forearm spoken of as supination and pronation, the turning or rotary movement of the forearm, were entirely missing. Plaintiff could not get the right hand closer than twelve inches to his face and the arm could not be used to tie a tie or button a shirt or to eat with or to hold a knife in cutting food. Although right handed, he was now forced to shave with his left hand and he did not dress himself. At the time of the trial he was learning to write with his right hand and was again able to drive his car. Plaintiff is handicapped in sleeping because unable to bend the arm at the elbow. This interferes with most positions of comfort while in bed. There was a scar near the point of the elbow but it was shrinking. The little finger, and half of the next finger, were affected by paralysis due to the impinging or pinching of the nerve by bones at the elbow. Where the injury tore the ligaments off the bone there was a deposit of calcium causing stiffness of the elbow. There was a numb or dead sensation in part of the hand and in the palm of the hand it pained as if it was being pinched. The only remedy would be to operate and cut away some of the bone that pinches the nerve but the results would be speculative. Due to injury of the ulnar nerve plaintiff was not able to spread his fingers.

Plaintiff's injuries are permanent. There is a ninety to ninety-five per cent loss of use of the elbow and a forty to fifty per cent loss of use of the arm as a whole. Plaintiff had suffered considerable pain and inconvenience with his arm and he had been and was nervous. His nervousness interfered with his general morale to some extent. Plaintiff incurred a hospital bill of $200, and doctors' bills of approximately $800, with medical services being continued almost three years after the date of the accident.

In determining whether or not the verdict was excessive the court must consider all facts shown by the evidence most favorable to plaintiff. [Gieseking v. Litchfield & Madison Railway Co., 344 Mo. 672, 127 S. W. (2d) 700, 708.] Plaintiff's evidence must be accepted as true and all reasonable inferences therefrom must be allowed. Every case must be considered in view of the evidence in the particular case.

In their insistence that the verdict is excessive appellants rely particularly on the case of Parks v. United Railways Co. (Mo.), 235 S. W. 1067, decided in 1921, where under somewhat similar evidence as to disabilities a verdict of $12,500 was reduced to $7000. However in that case the injuries were to the wrist and not to the elbow. Appellants, among others, cite and rely on the following: Rose v. St.

Louis-San Francisco Railway Co., 315 Mo. 1181, 289 S. W. 913; Young v. Lusk, 268 Mo. 625, 187 S. W. 849; Grange v. Chi. & E. I. Ry. Co., 334 Mo. 1040, 69 S. W. (2d) 955; Jenkins v. Mo. States Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666. In the Jenkins case, supra, a number of cases (involving arm or leg amputation) are reviewed where judgments for larger amounts were reduced to amounts between $10,000 and $12,500. At page 672 the court said: ''$10,000 being the usual standard where the amputation was below the knee or elbow. Where larger amounts have been allowed, there has been shown unusual loss of earnings or complications, requiring numerous operations and resulting in large expenditures for medical and hospital attention. [See, Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693.]'' The trial judge and jury saw the plaintiff and heard the testimony of the witnesses. We defer to their judgment. Viewing the evidence in a light most favorable to the plaintiff we cannot say that the damages awarded are patently excessive. There is substantial evidence in the record to support the amount of the verdict. There is nothing in the record to convince us that the jury were actuated by bias, prejudice or passion, and the amount of damages awarded is not such as to shock the judicial sense of right.

The judgment is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.,* absent.