B. P. OIL CORPORATION *v.* CLAUDE J. MABE

[No. 43, September Term, 1976.]

*Decided March 18, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE and ELDRIDGE, JJ., and reargued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE and ELDRIDGE, JJ., and JAMES MACGILL, Chief Judge of the Fifth Judicial Circuit and JOHN E. RAINE, JR., Chief Judge of the Third Judicial Circuit, specially assigned.

Argued and reargued by *Wilbur D. Preston, Jr.*, with whom were *B. Ford Davis* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*Amicus curiae* brief filed by Exxon Corporation, *Lewis A. Noonberg, Edward S. Digges, Jr., David F. Tufaro, Piper & Marbury* and *Richard P. Delaney* on the brief.

Argued and reargued by *Gordon W. Priest, Jr.*, and *Peter Parker*, with whom were *White, Page & Lentz* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. LEVINE, J., dissents and filed a dissenting opinion at page 649 *infra.*

The issue presented in this case is whether appellee, Claude J. Mabe (Mabe), established that a service station operator, Lonnie Faison (Faison), was an agent of appellant, B. P. Oil Corporation (BP). The Court of Special Appeals held in *Mabe v. B. P. Oil Corp.*, 31 Md. App. 221, 356 A. 2d

304 (1976), that an agency by estoppel was established. Since we conclude that Mabe failed to establish either actual agency or agency by estoppel, the judgment of the Court of Special Appeals will be reversed.

The incident giving rise to this litigation occurred when Mabe, accompanied by his father and his brother, noted the need for gasoline and water for his automobile and pulled into a filling station operated by Faison. He stated that he asked the attendant there for water to put in the radiator of the car. Mabe said that when its contents were placed in the radiator "it went down in the radiator and came back up and went on the motor and then it exploded," causing a fire which injured him. It seems to have been assumed by all parties that this was gasoline.

Mabe's suit against Faison and BP alleged that the service station in question was "owned and under the direction of the defendant B P Oil Corporation and operated by its agent Lonnie Faison, trading as Faison Service Station . . . ." He claimed that his injuries "stemmed directly from the negligent and tortious conduct of the defendants and their agents . . . ." A Baltimore City jury returned a verdict of $2,800 in favor of Mabe against BP.[1] The trial judge (Dorf, J.) granted BP's motion for judgment n.o.v., finding "no agency of any kind," and that "this case [was not] one of apparent authority or agency by estoppel." The Court of Special Appeals reversed.

The service station in question was painted yellow and green, said to be the BP colors. There was a large BP sign on a pole hanging over the station; BP insignia appeared on the gasoline pumps; there was a tow truck present with a BP sign on it, and the attendant in question wore a uniform with yellow and green BP emblems on his jacket and cap.

The service station building was leased by the owner to Faison. He leased it to BP who in turn leased it back to Faison. Gasoline tanks, pumps and signs were owned by BP. Under the agreement between Faison and BP, Faison was

---

1. There had been an earlier judgment by consent in favor of Mabe against Faison in the amount of $2,000.

required to "furnish, install and display continuously on the exterior of the station at a point visible and accessible to the public, a legible sign showing that [he was] occupying said station under a lease and [was] the sole owner of the business." Mabe was asked by his attorney whether there was "any sign up that said anything about being operated by anybody other than BP," to which he replied in the negative. The record is otherwise silent as to such a sign.

Under the agreement between BP and Faison he was to buy a minimum of 180,000 gallons of gasoline per year, which works out to 15,000 gallons per month. He testified, however, that he "was only buying 400 gallons of gasoline per week," a reason given for the fact that he did not participate in any promotion of BP, saying that he could not "afford to on that."

There is a suggestion by Mabe that the compensation of Faison was fixed and controlled by BP because under the lease arrangement he received a net of one and a half cents per gallon on gasoline sold. BP paid Faison two cents per gallon as its rental for the lease *from* Faison and he paid BP one-half cent per gallon as rent under the lease *to* him. This contention overlooks the fact that rent in some amount, not shown in the record, was due from Faison to the owner of the premises. Moreover, if he had no rent to pay to the owner, sale of the maximum of 230,000 gallons of gasoline provided in the contract would provide remuneration of only $3,450 per year. This makes it obvious that the profit to be derived by Faison from the operation of the service station in question came not from this source, but from the difference between the buying price and selling price of the gasoline and other items sold by him after deduction of other expenses of operation.

Faison was paid no salary or commission by BP. Any employees were hired, fired, and paid by him. He was required to make no reports to BP relative to his sales and service operation. He paid his own sales and other taxes. BP had no control over the hours of station operation, the hours of operation being fixed by Faison. Faison paid cash on delivery for that which he bought. If he did not have the

money to pay, he did not obtain the product. He provided his own uniforms and said that BP never told him that he had to wear a uniform of any kind.

An agreement was in existence between BP and Faison relative to the purchase of tires, batteries, and other equipment. He was not obliged to enter into such an agreement nor was any of this equipment a BP product. The record is unclear as to whether a BP representative periodically called on Faison to assist him by making suggestions calculated to increase sales. Faison said unequivocally that no such representative appeared. The BP sales supervisor who testified, but who at the time of this incident "was manager of the clerical force, record keeping, reports" and who became sales supervisor subsequent to this incident, said such representatives did call on Faison.

Mabe's reasons for entering the station in question were set forth in the following testimony on direct examination:

"Q Why did you choose the BP station?

"A Because I always buy BP gasoline, always deal with BP.

"Q Had you dealt with BP before?

"A Yes, up on 29th Street and Greenmount Avenue. I [sic] was right around the corner from where I lived at.

"Q How often had you dealt with them?

"A I had been dealing with them for around about a year at that time.

"Q Was there anything in particular you — attracted you to the BP station on Hilton Street?

"A Nothing except for the BP station, had BP signs, BP gas, BP pumps."

Although his brother twice said that reasons for entering this station were "the happy motoring sign" which he said "is a slogan and it means that there's good service," it was not actually established that such a sign, the sign of one of BP's competitors, was on the premises.

In passing upon the propriety of the trial judge's action in granting judgment n.o.v., we are obliged to resolve all conflicts of evidence in favor of the plaintiff, Mabe, to assume the truth of all evidence, and to accept such inferences as may naturally and legitimately be drawn from the evidence which tend to support the plaintiff's right to recover. *Dix v. Spampinato,* 278 Md. 34, 37, 358 A. 2d 237 (1976); *Fleming v. Prince George's County,* 277 Md. 655, 658, 358 A. 2d 892 (1976); *Taylor v. Armiger,* 277 Md. 638, 640, 358 A. 2d 883 (1976), and cases there cited.

## I

## Actual Agency

We first address ourselves to whether actual agency was established since there would be no reason to consider the doctrine of apparent agency or agency by estoppel if there were sufficient evidence of actual agency to warrant consideration of the case by the jury.

As far back as *DeFord v. State, use of Keyser,* 30 Md. 179 (1869), this Court stated that the presence or absence of control is an essential element in determining whether a master-servant relationship exists. Our predecessors there said:

"If they were at his command and bound to obey his orders and direction, in regard to the work they were engaged in, and could be, at any time he thought proper, discharged by him, then they were his servants, and he is liable for the consequences of their negligence and malfeasance committed in the course of their employment. But if, on the other hand, they were at work or directing the work on the building, as independent contractors or the servants and employees of independent contractors, over whom he could rightfully exercise no such control and direction, he is not so liable." *Id.* at 203-04.

Criteria for determination of whether a master-servant relationship exists were set forth in *Sun Cab Co. v. Powell,* 196 Md. 572, 77 A. 2d 783 (1951), where the Court said:

> "It is generally stated that there are four elements to be considered in determining the question whether the relationship of master and servant exists. These elements are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power of dismissal, and (4) the power of control of the servant's conduct." *Id.* at 577-78.

In *Keitz v. National Paving Co.,* 214 Md. 479, 134 A. 2d 296 (1957), Judge Prescott referred for the Court to these four criteria and then added a fifth, "whether the work is a part of the regular business of the employer." The power to control was the fourth item there listed. The opinion further stated:

> "Standing alone, none of these *indicia,* excepting (4), seems controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important. *Sun Cab Co. v. Powell,* 196 Md. 572, 578, 77 A. 2d 783; *Charles Freeland v. Couplin,* 211 Md. 160, 169, 170, 126 A. 2d 606." *Id.* at 491. (Emphasis in original.)

*Accord Clemons v. Bullock,* 250 Md. 586, 600, 244 A. 2d 240 (1968); *Anderson Nurs. Homes v. Walker,* 232 Md. 442, 444-45, 194 A. 2d 85 (1963); *Marine v. Service Trucking Co.,* 225 Md. 315, 319, 170 A. 2d 188 (1961); *L. & S. Co. v. State Accident Fund,* 221 Md. 51, 56, 155 A. 2d 653 (1959); *Snider v. Gaultney,* 218 Md. 332, 336-37, 146 A. 2d 869 (1958); and

*Greer Lines Co. v. Roberts,* 216 Md. 69, 78, 139 A. 2d 235 (1958). To like effect *see* Annot., 83 A.L.R.2d 1282, 1284, 1296 §§ 2 and 5 [b] (1962), 41 Am. Jur.2d *Independent Contractors* § 6 (1968), and 56 C.J.S. *Master and Servant* § 3 (3) (1948).

Cases from other jurisdictions which have recognized control as a necessary element and have found insufficient evidence of control to warrant a conclusion of the existence of a master-servant relationship and thus of actual agency in factual situations analogous to the case at bar include: *Smith v. Cities Service Oil Company,* 346 F. 2d 349, 352 (7th Cir. 1965); *Miller v. Sinclair Refining Company,* 268 F. 2d 114, 118 (5th Cir. 1959); *Greenberg v. Mobil Oil Corporation,* 318 F. Supp. 1025, 1030 (N.D. Tex. 1970) ("With the written contracts in evidence which established on their face that Robinson was an independent contractor, the only way plaintiffs could discharge their burden of proof was by showing that the contracts were a sham and subterfuge created for the purpose of defrauding the public."); *Apple v. Standard Oil, Division of American Oil Company,* 307 F. Supp. 107, 111-12 (N.D. Cal. 1969) ("Cases from other jurisdictions appear to hold uniformly that an oil company under comparable facts is not liable for the negligence of the lessee-operator, unless the company exercises 'control' over the lessee's operations, and support the conclusion that the facts upon which plaintiff relies in this case are insufficient to establish an agency, either actual or ostensible."); *Arkansas Fuel Oil Company v. Scaletta,* 200 Ark. 645, 654, 140 S.W.2d 684 (1940); *Drum v. Pure Oil Company,* 184 So. 2d 196, 198 (Fla. App. 1966); *Cawthon v. Phillips Petroleum Company,* 124 So. 2d 517, 519-20 (Fla. App. 1960); *Manis v. Gulf Oil Corporation,* 124 Ga. App. 638, 185 S.E.2d 589 (1971); *Reynolds v. Skelly Oil Co.,* 227 Iowa 163, 169, 170, 287 N. W. 823 (1939); *Levine v. Standard Oil Co.,* 249 Miss. 651, 654, 163 So. 2d 750 (1964); *Elkins v. Husky Oil,* 153 Mont. 159, 165, 455 P. 2d 329 (1969); *Shaver v. Bell,* 74 N. M. 700, 705-06, 397 P. 2d 723 (1964) ("Plaintiff . . . could not assume from the appearance of the station, which has standard Cosden signs and colors, that the station was operated by

Cosden. Neither is the use of an oil company's credit card facilities by an operator an indication that the oil company operates the station."); *Hudson v. Oil Co.*, 215 N. C. 422, 425, 2 S.E.2d 26 (1939) ("The existence of the Gulf signs on the premises which were being used for the sale of Gulf products is not inconsistent with the contract, nor does it tend to show that Braddy and his employees were in fact employees of the corporate defendant in contradiction of the terms of the lease."); *Coe v. Esau*, 377 P. 2d 815, 818 (Okla. 1963); *Green v. Independent Oil Company*, 414 Pa. 477, 201 A. 2d 207, 210-11 (1964); and *Westre v. De Buhr & Sinclair Ref. Co.*, 82 S. D. 276, 278-79, 144 N.W.2d 734 (1966).

*Coe* and *Westre* are so close factually to the case at bar as to warrant quotation at some length. In *Coe* the court said:

> "It is indeed a matter of common knowledge and practice that distinctive colors and trade mark signs are displayed at gasoline stations by independent dealers of petroleum product suppliers. These signs and emblems represent no more than notice to the motorist that a given company's products are being marketed at the station." (Citing cases.)

> \* \* \*

> "Whether relation of master and servant does in fact exist between lessor of gasoline station and its lessee so as to render the doctrine of respondeat superior applicable, depends on whether lessor has the right to control, or exercises the right to control, lessee in the details of the work to be performed in the operation and management of the station. [Citing cases.]

> "The facts and circumstances adduced by plaintiff's evidence are insufficient to raise the necessary inference that Continental either had the right to control or exercised the right to control the conduct of Esau in the operation of his station. Esau was free to, and did handle, tires and

automotive accessories of other suppliers; he procured his own personnel, determined the daily business hours and the methods of doing business. The petroleum products supplied by Continental were sold to Esau on a cash basis. So far as the record discloses, Esau was not in any way restricted in adopting his own merchandising policies." *Id.* 377 P. 2d 818-19.

In *Westre* the court said:

"Suffice it to say that the deciding factor appears to be the extent of the control exercised by the oil company, and that the decided weight of opinion in the cases with leases and sales agreements similar to the ones presented here, holds that the service station operator occupies the position of an independent businessman rather than an employee.

"The lease in question here is a form printed by Sinclair Refining Company providing for a rental computed at 1.5 cents per gallon of gasoline delivered to said station for sale therefrom, with a minimum of $150 except for August through November, when the minimum is $125. It was further provided that if the amount of rental is computed on the volume of business, that lessee agrees to promote diligently the sale of gasoline and other products, and keep the station open for the same time as competing service stations were open. The lease also contained a provision that the rest rooms and toilet shall be kept clean and hygienic so as to comply with standards set by any laws or ordinances, and a further provision that, without lessor's prior written consent, no part of the station could be used for motor overhauling, body and fender repairing or refinishing, tire recapping, welding or for any activity which cannot be conducted safely in the presence of volatile petroleum products. There is also a clause wherein lessee agrees to indemnify lessor for any liability

for damages arising out of the operation of the station.

"Similar types of clauses are found in many leases. None of these indicate the type of control sufficient to establish anything but a landlord-tenant relationship. Nor does the fact that the rental was lowered at one time indicate anything but a desire to retain a tenant. The sales agreement established nothing more than a seller-purchaser arrangement. No social security or taxes were withheld by Sinclair, nor unemployment taxes paid by Sinclair. In most of the cases where the courts have held the station operator to be an employee, these taxes and withholdings have been paid by the oil company. Other indications of the independent nature of DeBuhr's business included: payment of all expenses, and receipt of all income without any accounting to Sinclair; freedom of operation of the business, and employment of help; retail sales license in DeBuhr's name; DeBuhr's ownership of the hand tools and much of the equipment.

"The oil company did furnish some assistance to DeBuhr. One of these was that it agreed to accept at face value all purchases made on credit cards, provided that the products or services were authorized. Honoring credit cards was entirely the option of DeBuhr. Sinclair also made available service manuals, use of which was optional, and conducted service schools, attendance at which was optional. This is nothing more than most manufacturers furnish to their independent dealers. Nor was any authority or control shown to have been exercised by Sinclair's representative, T. E. Boch. He may have sent in a few customers, but it is not unusual for wholesalers and distributors to aid their independent dealers in promoting sales." *Id.* 82 S. D. 278-79.

The need for control for there to be liability upon the part of the oil company lessor was recognized in *Chevron Oil Company v. Sutton*, 85 N. M. 679, 515 P. 2d 1283, 1286 (1973). Control was recognized as necessary and was found in *Gulf Refining Co. v. Brown*, 93 F. 2d 870, 873 (4th Cir. 1938); *Becker v. Aschen*, 344 Mo. 1107, 1117, 131 S.W.2d 533 (1939); and *Brenner v. Socony Vacuum Oil Co.*, 236 Mo. App. 524, 158 S.W.2d 171 (1942). The evidence adduced in *Brown*, however, was materially different from that adduced here, there being a whole series of facts from which one could infer control on the part of Gulf Refining Company.

In the case at bar the evidence adduced on behalf of Mabe simply does not show that BP controlled Faison's operations. Accordingly, actual agency was not established.

II

Apparent Agency or Agency by Estoppel

One thing upon which the parties here can agree is that the law applicable to such an agency is that stated in Restatement (Second) of Agency § 267 (1958):

> "One who represents that another is his servant or other agent and thereby causes a third person justifiably *to rely* upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." (Emphasis added.)

Restatement of Agency § 267 (1933) is identical to the above. Two Maryland cases are cited in the annotations to it, *Pennsylvania R.R. v. Hoover*, 142 Md. 251, 120 A. 526 (1923), and *Pugh v. Washington Ry. & Elec.*, 134 Md. 196, 106 A. 522 (1919). The plaintiff was permitted to recover in *Hoover* despite a contention that his injury took place at a station owned by the West Jersey and Seashore Railroad in Atlantic City. It was a part of the system of the Pennsylvania Railroad. He had bought a round trip ticket from Baltimore to Atlantic City from Pennsylvania R. R. The Court found

significant that "[a]bove the station was a large sign bearing the defendant's name, and the same designation appeared upon all the cars of which the trains entering and leaving the station were composed." *Pugh* also involved a controversy between a passenger and a common carrier. Apparently there were several companies involved in the operation of streetcars in the Washington, D. C., area, which companies all had their offices at the same place in the District of Columbia. The Court noted that "the conductors and motormen wore the same uniforms and they carried the books of rules promulgated by that system for their guidance and direction." The Court declined to recognize the claim that an entity separate from the Washington Railway and Electric Company operated the line on which the alleged assault took place, saying that "[t]here [was] nothing whatever in the evidence to show that there was any notice to the public or to the passengers on either road that there was any distinction between the operation of the Georgetown Company and that of any other company in the system." One may infer in each instance, under the facts of those cases, that the passengers relied upon the parent company.

The textwriters indicate that reliance is necessary to establish agency by estoppel. *See, e.g.*, 1 F. Mechem, *Law of Agency* § 245 (2d ed. 1914) which states in discussing the matter:

> "Estoppel is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, or that some one else was, so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough." *Id.* at 177-78.

The cases we have examined seem to be uniformly in agreement with the statements in the Restatement and Mechem to the effect that for there to be liability in a case

such as this there must be actual reliance upon the part of the person injured. For instance, in *Standard Oil Co. v. Gentry*, 241 Ala. 62, 65, 1 So. 2d 29 (1941), relied upon by Mabe, the court referred to the fact that "plaintiff's evidence tended to show he continued to rely upon the appearance of things, that is, that the Standard Oil Company was still operating the station where he received his injuries, and according this proof due weight the jury might well infer that his reliance throughout was upon the company's pecuniary responsibility to answer for any default arising out of his business engagements with it." The defendant in that case had operated the service station in question up until about three and a half months before the incident giving rise to the suit. In *Gizzi v. Texaco, Inc.*, 437 F. 2d 308, 309 (3d Cir.), *cert. denied*, 404 U. S. 829 (1971), also relied upon by Mabe, the court said, "In order for the third person to recover against the principal, he must have relied on the indicia of authority originated by the principal, Bowman v. Home Life Ins. Co. of America, 260 F. 2d 521 (3d Cir. 1958); Restatement (Second), Agency § 267 and such reliance must have been reasonable under the circumstances." (Citing cases.) Unlike this case, the plaintiff there "testified that he was aware of the advertising engaged in by Texaco and that it had instilled in him a certain sense of confidence in the corporation and its products." *Sanders v. Clark Oil*, 57 Mich. App. 687, 691, 226 N.W.2d 695 (1975), is yet another case standing for the principle that for there to be "agency by estoppel . . . the principal, by its acts and conduct, [must have] held the alleged agent out as being authorized; and [the] third person [must have] relied in good faith upon such representation."

A number of courts around the country have stated the law in the above fashion and have failed, in circumstances analogous to the case at bar, to find liability upon a defendant such as BP in the instant case. *See, e.g., Miller v. Sinclair Refining Company*, 268 F. 2d 114, 118 (5th Cir. 1959); *Apple v. Standard Oil, Division of American Oil Company*, 307 F. Supp. 107 (N.D. Cal. 1969), where in

finding that the plaintiff had "failed to establish an agency, either actual or ostensible," the court said:

> "Apple had no contact with the defendant. He had a credit card of another company, first issued 14 years earlier. The card itself shows that the sign of the issuing company was distinct from that of the defendant. Apple stopped at the station to purchase a fan belt. The only reason he selected that particular station was because it would honor his credit card. He had never been there before. There is no evidence that defendant supplied Selbe with fan belts. There is evidence that Selbe was not required to purchase accessories from the defendant." *Id.* at 115;

*Union Oil Company of California v. Crane,* 288 Ala. 173, 258 So. 2d 882, 887 (1972); *Drum v. Pure Oil Company,* 184 So. 2d 196 (Fla. App. 1966); *Cawthon v. Phillips Petroleum Company,* 124 So. 2d 517, 520-21 (Fla. App. 1960); *Manis v. Gulf Oil Corporation,* 124 Ga. App. 638, 640, 185 S.E.2d 589 (1971); *Crittendon v. State Oil Co.,* 78 Ill. App. 2d 112, 118-19, 222 N.E.2d 561 (1966); *Reynolds v. Skelly Oil Co.,* 227 Iowa 163, 287 N. W. 823 (1939), where the court said:

> "The argument of appellee that the Skelly Oil Company was estopped because of the signs displayed and that, because of such signs, there was a presumption that the station was owned by the Skelly Oil Company has no support in reason or authority. As well argue that, because the word 'Chevrolet' or 'Buick' is displayed in front of a place of business, General Motors would be estopped to claim that it was not the owner of the business. It is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers." *Id.* at 171;

*Sherman v. Texas Co.,* 340 Mass. 606, 608, 165 N.E.2d 916 (1960) (the court referred to *Reynolds* and said, "We rule that the representation of the signs was confined to the

statement that Texaco gasoline was sold at the station.");
*Levine v. Standard Oil Co.*, 249 Miss. 651, 655, 163 So. 2d 750
(1964) ("The presence of 'Standard Oil' signs and similar
emblems on the uniform of the station attendants was not
sufficient to establish an agency relationship."); *Elkins v.
Husky Oil*, 153 Mont. 159, 168, 455 P. 2d 329 (1969); and
*Westre v. De Buhr & Sinclair Ref. Co.*, 82 S. D. 276, 279-80,
144 N.W.2d 734 (1966), quoting *Reynolds.* To like effect *see* 3
Am. Jur.2d *Agency* § 75 (1962), and 2A C.J.S. *Agency* § 162
(1972). A similar holding is found in *Sennott v. Rodman &
Renshaw*, 474 F. 2d 32, 38-39 (7th Cir.), *cert. denied*, 414
U. S. 926 (1973), where the court in a controversy concern-
ing a security transaction quoted from and relied upon
*Crittendon.*

In the view we take of this case we need not discuss any
factors of agency by estoppel other than that of reliance
because Mabe has fallen far short of having established any
such reliance when he entered Faison's service station. Any
reasons advanced by others in his vehicle for entering the
service station in question can have no bearing because, as
Mechem, *supra*, states it, "Estoppel is always a matter
*personal* to the individual asserting it and *he* must therefore
show that *he* was misled by the appearances relied upon."
(Emphasis added.)

Mabe suggests that "[t]he *reductio ad absurdum* of this
position [(that there must be personal reliance)] would be
to deny recovery to the child in *Edwards v. Gulf Oil
Corporation*, 69 Ga. App. 140, 24 S.E.2d 843 (1943), because
the parent had made the ultimate decision to enter the
station there in question." The parent did not make the
decision in that case and Mabe obviously intends this
statement purely for purposes of argument. In *Edwards* a
mother was held to have made out a cause of action to
recover for the death of her minor child. She alleged
negligence on the part of a service station operator and an oil
company "in that no warning device or protection was placed
around some boiling tar which was used in front of the
filling-station of the corporation," operated for it by an
individual who "wore a uniform and cap with the name

'Gulf' written on them . . . ." The court said the evidence showed "there were signs reading 'Gulf Oil Corporation' over the station and on the gasoline pumps and oil tanks used at the station," that the operator had "invited children to come to the station to get comic papers printed by the corporation," that children frequently went there for that purpose, and that "on the occasion when the plaintiff's child was injured he had been to the station with other children to get these comics, and as he was leaving he slipped and was precipitated into the boiling tar because there were no barriers and the tar was not covered." The facts of *Edwards* are so close, aside from the issue of the relationship between the service station operator and the oil company, to those in *Herring v. Christensen*, 252 Md. 240, 249 A. 2d 718 (1969), where we held there was no liability on the part of a landowner to a child who was burned when he ventured onto a neighbor's property, that one wonders whether the child in *Edwards* would have been permitted under the facts of that case to recover in Maryland. *See* the review of Maryland cases relative to trespassers and licensees in *Hicks v. Hitaffer*, 256 Md. 659, 669-70, 261 A. 2d 769 (1970). Prior to the enactment in 1956 of what is now Code (1974) § 10-910 Courts and Judicial Proceedings Article providing that "[i]n an action on behalf of an infant to recover for death, personal injury, or property damage the negligence of the parent or custodian of the infant may not be imputed to the infant," the law in Maryland was that if the custodian were guilty of a failure to exercise ordinary care which contributed to bring about the child's injury, that lack of care prevented recovery on the child's behalf. *Graham v. Western Md. Dairy*, 198 Md. 210, 214, 81 A. 2d 457 (1951), and *Caroline County v. Beulah*, 153 Md. 221, 227, 138 A. 25 (1927). *See* the discussion of this principle by Judge Digges for the Court more recently in *Caroline v. Reicher*, 269 Md. 125, 130, 304 A. 2d 831 (1973). It thus would seem to follow by analogy that, in the absence of a statute to the contrary, reliance upon the part of a parent or custodian of a child of tender years would be sufficient to permit recovery on behalf of a child if the facts and circumstances were such

that the parent or custodian might have been able to recover for injury to that parent or custodian. Such, however, is not this case and we leave open for another day resolution of any such problem.

In this instance Mabe is an adult who was in full control of the vehicle. He said he was attracted to Faison's station by "[n]othing except for the [fact that it was a] BP station, [and it] had BP signs, BP gas, BP pumps." This, added to the statement of Mabe that his reason for choosing the station in question was that he "always buy[s] BP gasoline, always deal[s] with BP," is but little different from a statement that one always buys a particular make of shoes, wears clothes with a certain label, drives an automobile produced by a certain manufacturer, eats a certain brand of breakfast cereal, or smokes a certain kind of cigarette. In short, the record lacks any evidence of reliance upon the part of Mabe. There has been comment in some of the cases and in the brief of Mabe relative to advertising which may have enticed prospective customers into places of business. The record in this instance is completely silent as to any advertising on the part of BP.

Because there is no evidence of any kind of reliance on the part of Mabe and no evidence of actual agency, Judge Dorf properly granted the motion for judgment n.o.v.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for the passage of an order affirming the judgment of the Superior Court of Baltimore City; appellee to pay the costs.*

*Levine, J., dissenting:*

I agree with the Court of Special Appeals, sitting en banc with but one judge dissenting, that the trial judge erred in granting the motion for judgment n.o.v. Viewed in the light most favorable to Mabe, the evidence was sufficient for the jury to conclude that BP represented to Mabe that Faison

was its agent, and that the representation thereby caused Mabe justifiably to rely upon Faison's skill. *See* Restatement (Second) of Agency § 267 (1957). Consequently, I would affirm the judgment of the Court of Special Appeals, which entered a judgment upon the jury verdict.

While I agree with the majority that Faison was not BP's actual agent, I believe that he was BP's apparent agent, since, under the circumstances, apparent authority was created:

> ". . . [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* at § 27.

What Mabe observed were the indications by signs and advertising that the station was a BP station; nothing attracted him "except for the BP station, . . . BP signs, BP gas, BP pumps." The attendant "had a BP uniform" which was "[g]reen with the yellow BP," "had a BP hat and just a regular BP service man. BP service man." Although these manifestations may have been directed to the community at large, they were "words" or "conduct" within the contemplation of § 27. *See* Restatement, *supra,* § 8, Comment b.

Moreover, in my view, a jury could find that BP's manifestations, reasonably interpreted, caused Mabe to believe that BP consented to have Faison service his car. According to the majority's position, it is common knowledge that a substantial portion of gas stations are independently owned and that the signs mean merely that a customer may purchase BP products. The short answer is that many stations are company owned, and BP, as a principal, is responsible for the information which came to Mabe's attention. *Id.* at § 27, Comment a. In this instance, although Mabe saw all these indicia of BP control, he saw no sign — and there was none — which stated that Faison was

the sole owner of the business. In my view, Mabe reasonably assimilated the information available to him and concluded that Faison was a BP agent.[1] *See Wood v. Holiday Inns, Inc.,* 508 F. 2d 167, 175-77 (5th Cir. 1975); *Gizzi v. Texaco, Inc.,* 437 F. 2d 308, 310 (3d Cir.), *cert. denied,* 404 U. S. 829 (1971); *Standard Oil Co. v. Gentry,* 241 Ala. 62, 1 So. 2d 29, 31-32 (1941); *Beck v. Arthur Murray, Inc.,* 245 Cal. App.2d 976, 54 Cal. Rptr. 328, 330 (1966); *Johnston v. American Oil Company,* 51 Mich. App. 646, 215 N.W.2d 719, 721 (1974); *Chevron Oil Company v. Sutton,* 85 N. M. 679, 515 P. 2d 1283, 1286-87 (1973); *cf. Taxi Operators v. Kern,* 178 Md. 252, 254-59, 13 A. 2d 374 (1940) (Diamond Cab held liable for injuries sustained in hit and run accident where cabs were individually owned but all bore same markings). *See also Sheraton Corp. of Am. v. Kingsford Packing Co., Inc.,* 319 N.E.2d 852, 857 (Ind. App. 1974).

I believe also that the evidence was sufficient to permit a jury to conclude that Faison's apparent authority caused Mabe justifiably to rely on Faison's skill. Although, in my view, the majority erroneously excludes the testimony of Mabe's father and brother on the issue of Mabe's reliance, I conclude that in any event, Mabe's testimony alone presented a jury question.[2] Mabe testified that in addition to the BP station, there were two other stations within sight

---

1. Indeed, although Mabe did not know it at that time, BP may have been actively acquiescing in the concealment of Faison's ownership of the business. BP recognized its responsibility to avoid deceiving the public, because in the lease BP explicitly required Faison to "furnish, install and display continuously on the exterior of the station at a point visible and accessible to the public, a legible sign showing that [Faison] is occupying said station under a lease and is the sole owner of the business." Since the lease reserved to BP the right to inspect the station, and to terminate the lease and repossess the property without notice upon the breach of any of the covenants therein, BP's failure to enforce the quoted provision during the three years prior to the accident may well have created an agency by estoppel. *See* Restatement (Second) of Agency § 8B (1) (1957).

2. The majority excludes the testimony of Mabe's father and brother in the belief that their testimony is irrelevant to the issue of whether Mabe himself relied on Faison's apparent authority. Quite to the contrary, that testimony is probative circumstantial evidence supporting both Mabe's understanding of BP's manifestations and the reasonableness of his reliance upon them, especially since all three Mabes were subject to the same influences and were similarly situated. In any event, BP did not object to the excluded testimony now ignored by the majority.

when he noticed that his engine was overheating. He chose to enter the BP station because "I always buy BP gasoline, *always deal with BP*." (Emphasis added.) That he had patronized a BP station near his home for about a year prior to the accident provided support for this testimony. Mabe's statement, although perhaps not explicit, clearly permitted the jury to infer that he trusted the skill of those whom he thought were BP's agents, as well as the quality of BP's products.

The majority, on the other hand, emphasizes that Mabe presented no evidence to show that BP's media advertising encouraged reliance on the skill of BP's agents, and therefore concludes that it was unreasonable for Mabe to rely on Faison's *skill*. Rather, in the majority's view, reliance only on Faison's *products* was justified.

The logic of the majority's opinion completely escapes me. BP's media advertising is irrelevant to the determination of reliance because Mabe has presented a compelling case of justification for his reliance, superior to any which he might have presented had he relied solely on advertising. Mabe relied not on impersonal media commercials, but rather on his substantial and continuous personal experience with BP over a period of more than a year. In short, Mabe's patronage of a BP station, although not Faison's BP, more effectively established Mabe's trust in BP's skill and products than any advertising could have hoped to accomplish. The same decisive fact, prior patronage inducing reliance on a person's skill, was present in *Standard Oil Co. v. Gentry*, 1 So. 2d 29, where the oil company was held liable. *Cf. Gizzi v. Texaco, Inc.*, 437 F. 2d at 310 (Texaco held liable where plaintiff relied on advertising).

Since Mabe justifiably relied on Faison's skill as a result of Faison's apparent authority, I believe that BP should be liable to Mabe as if Faison were BP's agent. *See* Restatement, *supra*, § 267; *Wood v. Holiday Inns, Inc.*, 508 F. 2d at 175-77; *Gizzi v. Texaco, Inc.*, 437 F. 2d at 310; *Standard Oil Co. v. Gentry*, 1 So. 2d at 31; *Beck v. Arthur Murray*,

*Inc.*, 54 Cal. Rptr. at 330; *Johnston v. American Oil Company*, 215 N.W.2d at 721; *Chevron Oil Company v. Sutton*, 515 P. 2d at 1286-87. *See also Sheraton Corp. of Am. v. Kingsford Packing Co., Inc.*, 319 N.E.2d at 858-59.

I therefore dissent.