570 A.2d 840

**CHEVRON, U.S.A., INC. et al.**

**v.**

**Warren Robert LESCH et al.**

**No. 86, Sept. Term, 1988.**

Court of Appeals of Maryland.

March 7, 1990.
Motion for Reconsideration Denied April 2, 1990.

Donald E. Sharpe (Elizabeth C. Kelley, Piper & Marbury, David D. Patton, all on brief), Baltimore, Charles N. Ketterman (Montedonico & Mason, Chartered, both on brief), Baltimore, for petitioners.

Glenn E. Bushel (Ira L. Oring, Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, H. Patrick Stringer, Jr. and Mudd, Harrison & Burch, Towson, all on brief), for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

McAULIFFE, Judge.

Dr. Warren R. Lesch and his wife were severely burned and suffered the loss of their home and its contents when an explosion occurred in their garage in July 1985. The Lesches filed suit in the Circuit Court for Harford County,

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

contending that the explosion was caused by the negligence of Malcolm Weeks, an employee of Walker's Chevron, Inc. (Walker's Chevron). Walker's Chevron owned and operated an automobile service station business located on Conowingo Road in Bel Air, Maryland. It leased the premises, and also purchased gasoline, oil, and lubricants from Bay Oil, Inc. (Bay Oil), a jobber.[1] Walker's Chevron was a "branded station"; that is, it displayed the signs and colors of a particular brand, Chevron, and sold only that brand of gasoline and oil.[2] Bay Oil purchased the Chevron products that it sold to Walker's Chevron from Chevron U.S.A., Inc. (Chevron U.S.A.), a national oil company.

The Lesches sued Weeks, Walker's Chevron, Bay Oil, and Chevron U.S.A. The claims against Weeks and Walker's Chevron are based on Weeks's alleged negligence in failing to properly repair a leak in the gas tank of the Lesch automobile, and on the vicarious liability of Walker's Chevron as the employer of Weeks. The claim against Bay Oil is grounded on the theory that Walker's Chevron and its employees were servants of Bay Oil, subject in fact to its control.

The complaint against Chevron U.S.A. proceeds on theories of apparent agency, or agency by estoppel. The Lesches contend that Chevron U.S.A. created, or knowingly allowed to exist, a situation that actually conveyed to the Lesches the reasonable belief that Weeks was an employee of Chevron U.S.A., and therefore possessed the skill that they had the right to expect of one under the control and supervision of a major oil company. They entrusted the repair work to Weeks and Walker's Chevron because of that belief, and they suffered damage because of that reliance.

---

1. A "jobber" is an individual or corporation who purchases gasoline products from a wholesaler for resale to a dealer. See Maryland Code (1975, 1983 Repl.Vol.) § 11–301(h) of the Commercial Law Article.

2. Walker's Chevron sold other automotive products that were neither manufactured nor sold by Chevron U.S.A., Inc.

Before trial, Bay Oil and Chevron U.S.A. filed motions for summary judgment. Judge Cypert O. Whitfill granted the motions, concluding from facts not in dispute that Bay Oil neither possessed nor exercised that degree of control over Walker's Chevron which would give rise to vicarious liability, and that any belief entertained by the Lesches that employees of Walker's Chevron were employees of Chevron U.S.A. was not justified by the facts, and was unreasonable as a matter of law.

With the concurrence of all parties, and under circumstances we find were appropriate, Judge Whitfill entered final judgment in favor of Bay Oil and Chevron U.S.A., expressly finding that there was no just reason for delay. Maryland Rule 2–602(b). The plaintiffs appealed, and the Court of Special Appeals reversed, directing that both judgments be vacated. *Lesch v. Chevron*, 75 Md.App. 669, 542 A.2d 1292 (1988). We granted certiorari, and we now reverse the judgment of the intermediate appellate court.

The facts surrounding the repair in question, and the subsequent explosion, are as follows. On 14 July 1985, Dr. Lesch became aware that the gas tank of his Buick automobile was leaking, apparently as a result of having been struck by a metal rod he had run over earlier in the day. He pushed the car out of his garage and hosed down the garage floor. The next morning, he called Walker's Chevron, with whom he dealt regularly, and reported the problem. Weeks arranged to have Dr. Lesch's car towed to the service station, and after determining that there was a small puncture in the tank, called Dr. Lesch. The content of that conversation is in dispute, but in any event, Weeks proceeded to attempt a repair. He cleaned the tank in the area of the hole with a solvent, pressed air conditioning duct tape into or over the hole, inserted a screw into the hole and covered the patch with a multi-purpose epoxy. After allowing the epoxy to set up for one to two hours, Weeks put several gallons of gasoline in the tank and checked it for leaks. Finding none, he filled the tank and parked the car. Dr. Lesch picked up the car the next day.

Weeks explained the nature of the repair to Dr. Lesch, and said he had not observed any leaks. Weeks suggested, however, that Dr. Lesch "keep an eye on it." That afternoon and evening, Dr. Lesch made several checks for evidence of leaks, but saw nothing. The next morning, however, he and his wife smelled an odor of gasoline, and went to the garage to investigate. Dr. Lesch said that he was careful not to turn on any lights, or to activate the electric garage door opener. Perceiving a significant odor of gasoline in the garage, he stated that he disengaged the garage door from the electric opening device, and manually raised the door. He said that when the door reached a certain height it activated a light on the housing of the electric door opener, and the explosion occurred. Dr. Lesch suffered second degree burns to 45 percent of his body, and Mrs. Lesch incurred second and third degree burns to 45 percent of her body. Their home and all of its contents were destroyed by the ensuing fire.

Additional facts pertaining to the relationship that existed between the Lesches and Walker's Chevron, and between the several defendants, as well as additional facts bearing on the possible appearance of an agency relationship between Walker's Chevron and Chevron U.S.A., will be set forth as we discuss the separate theories of liability.

## I.

### *Bay Oil—The Claim of Actual Agency*

Bay Oil is a petroleum products jobber doing business primarily in Harford, Cecil and Baltimore counties. It has, for some time, purchased petroleum products from several national gasoline producers, and sold those products to branded and unbranded retail gasoline service stations. It became a Chevron jobber in 1972, after which it provided Chevron products to branded Chevron dealers. Contractual rights and obligations between Bay Oil and Chevron U.S.A. for the period of time involved in this case were controlled by a Branded Jobber Petroleum Products Agreement dated

11 September 1984.  As part of this agreement, Bay Oil was authorized to supply Chevron products and "insignia" [3] to those retail stations that were approved by Chevron U.S.A. as acceptable outlets for Chevron branded products.

The service station involved in this case was first approved as a Chevron branded station in 1976.  The business of that station was then owned by Ben Walker, and was operated as a sole proprietorship.  Ben Walker had been in the service station business for some time, and had owned the business at this particular station since the mid–1960's.  Prior to that time, he had owned a service station business on Rock Spring Road, approximately two miles from the Conowingo Road station.  The Rock Spring Road location was a branded Sinclair station, and Ben Walker traded there as Walker's Sinclair.  When he moved his business to Conowingo Road, he continued to operate as Walker's Sinclair.  In the mid or late 1960's, B.P. Oil, Inc. bought Sinclair, and Walker's Sinclair became Walker's BP.  In 1976, Bay Oil obtained a leasehold interest in the Conowingo Road property from B.P. Oil, Inc., and in turn entered into a sublease with Ben Walker.  It was at that time that Bay Oil entered into a Reseller's Contract with Walker, and Walker's BP became Walker's Chevron.

The original Reseller's Contract, which was apparently extended by an oral agreement of the parties, was a fairly simple document consisting of two pages.  Bay Oil agreed to sell and deliver, and Ben Walker agreed to buy, certain quantities of Chevron gasoline, oil, and lubricants.  Additionally, Bay Oil agreed to lease an eight foot internally lighted Chevron sign and a credit card imprinter to Walker.  The contract did not grant Bay Oil any control over the operation of Walker's business, and included this provision:

> It is the spirit and intent of this contract that Buyer will have the right to conduct and carry on the business of selling at retail, automobile fuel and gasoline and

---

**3.**  The agreement defined "insignia" as "trademarks, service marks, trade names, color schemes and service station designs."

lubricating oils and greases, wholly free and independent of any domination or control by Seller; and nothing in this contract is intended or shall be construed to give Seller any domination or control of Buyer's said business.

The original lease agreement between Bay Oil and Walker's Chevron was also an uncomplicated pre-printed document consisting of two pages. It provided, at paragraph 10, that:

The provisions of this lease shall not be construed as reserving to the Lessor any right to exercise any control over the business or operations of the Lessee conducted upon the leased premises or to direct in any respect the manner in which any such business and operations shall be conducted.

Although these provisions are not controlling, they may be of assistance in determining the intent of the contracting parties.

In support of their contention that Bay Oil exercised actual control over Walker's Chevron, plaintiffs point to a letter of 16 December 1982 from Bay Oil to Ben Walker. This letter advised Walker "of certain problems regarding the operation of your service station," and stated that if Walker wished to continue to occupy the premises, then he would be expected to conform to certain conditions. The conditions stated in the letter were:

1. The station will be kept clean and free of debris and trash at all times.

2. The station will be opened seven days per week no later than 7:00 a.m. and closed no earlier than 8:00 p.m.

3. The station will be properly lighted in a manner to give the appearance the station is open for business between sundown and 8:00 p.m.

4. All junk cars will be removed immediately, no more than three motor vehicles shall remain outside overnight and no automobile shall remain on the premises for more than one week.

5. You will be expected to furnish a deposit of $700.00 as security for future payments of rent.

6. Gas will be paid for in full at the time of delivery.

7. Monthly rent will be calculated based on the previous month's sales according to the attached schedule.

8. We will bill you for rent at the beginning of each month. Your rent shall be due upon receipt of the bill.

The Court of Special Appeals, characterizing this letter as an ultimatum, held that its contents constituted sufficient evidence of Bay Oil's power to control the conduct of Walker's Chevron to permit a trier of fact to find the existence of a master-servant relationship. *Lesch v. Chevron, supra,* 75 Md.App. at 698–700, 542 A.2d 1292. We do not agree.

In evaluating the relationship that existed between these parties to determine whether Bay Oil may be held vicariously liable for the torts of employees of Walker's Chevron, we keep in mind that not every close relationship will create that liability. One may be an agent of another, owing to his principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered a servant. *See Brady v. Ralph Parsons Co.,* 308 Md. 486, 510–512, 520 A.2d 717 (1987). The relationship of master and servant exists only when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done. *Id.* at 510; *Mackall v. Zayre Corp.,* 293 Md. 221, 230, 443 A.2d 98 (1982).

In *Keitz v. National Paving Co.,* 214 Md. 479, 491, 134 A.2d 296 (1957), this Court said:

[T]here are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia,* excepting (4), seems controlling in

the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* (emphasis in original).

To like effect, *see Whitehead v. Safway Steel Products,* 304 Md. 67, 77–78, 497 A.2d 803 (1985); *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 637–39, 370 A.2d 554 (1977).

Assuming, as we do for the purpose of considering Bay Oil's motion for summary judgment, that the plaintiffs could establish that Ben Walker, and his successor, Walker's Chevron, had accepted and agreed to be bound by the conditions imposed by Bay Oil, we hold that to be insufficient evidence of the right on the part of Bay Oil to exercise the degree of control that would support a claim of vicarious liability. This exercise of control by Bay Oil flows partly from its status as landlord, and partly from its status as jobber. Provisions dealing with required cleanliness of the premises, number of cars that may be parked overnight, and revised rent structures are customary in lease agreements. *See, e.g., Miller v. Sinclair Refining Company,* 268 F.2d 114, 117 (5th Cir.1959); *Texas Co. v. Wheat,* 140 Tex. 468, 168 S.W.2d 632, 635 (1943). Because the parties apparently were in agreement that they were on a month-to-month rental basis, Bay Oil announced the change in terms as a condition to the continuation of the lease. For example, Item 2, dealing with the minimum hours of operation of the station, parallels a provision that was contained in the original, pre-printed lease, but which had not been filled in by the parties. In addition, Item 6, which provided that gas would be sold to Walker's Chevron on a C.O.D. basis, was entirely in accordance with the Reseller's Contract that existed between the parties. Individually or collectively, these conditions did not demonstrate a claim to, or exercise of, the degree of control required to establish a master-servant relationship. Summary judgment was correctly entered in favor of Bay Oil.

## II.

*Chevron U.S.A.—The Claim of Apparent Agency*

Plaintiffs do not contend that a master-servant relationship existed between Chevron U.S.A. and Walker's Chevron, and the facts of record would not support the contention if made. Rather, plaintiffs contend that Chevron U.S.A. is liable for the negligent acts of employees of Walker's Chevron because Chevron U.S.A. influenced the plaintiffs to believe that Weeks was its employee and, reasonably relying on that apparent relationship and the care and skill that the plaintiffs believed a mechanic employed by Chevron U.S.A. would possess, they entrusted the repair to Weeks, to their detriment. This theory of liability, most often referred to as apparent agency or agency by estoppel,[4] was before us in *B.P. Oil Corp. v. Mabe, supra,* and more recently in *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977).

As we pointed out in *B.P. Oil Corp. v. Mabe, supra,* the law applicable to the plaintiffs' claim against Chevron U.S.A. is that set forth in *Restatement (Second) of Agency,* § 267 (1958):

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

In order to recover on this theory, in addition to showing that Weeks was negligent and that his negligence was a proximate cause of the ensuing damage, plaintiffs must show that: 1) they were misled by appearances by Chevron U.S.A. into believing that Weeks was an employee of Chev-

---

**4.** Although often spoken of interchangeably, and in some factual situations indistinguishable in effect, the concepts of apparent agency and agency by estoppel are somewhat different. *See Medical Mut. Liab. v. Mutual Fire,* 37 Md.App. 706, 721, 379 A.2d 739 (1977); *Restatement (Second) of Agency,* Comment *d* to § 8 (1958).

ron U.S.A.; 2) this belief was objectively reasonable under all the circumstances; and, 3) they relied on the existence of that relationship in making their decision to entrust Weeks with the repairs. *See B.P. Oil Corp. v. Mabe, supra,* 279 Md. at 644–45, 370 A.2d 554. *See also Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 791 (3rd Cir.1978). One commentator has described the first two requirements in these terms:

> The first [test] is objective: could a reasonable man believe that the company's manifestations of apparent authority indicate it is holding the operator out as its agent? The second is subjective: did the facts known by the plaintiff in a particular case reasonably justify his assumption that the operator was the company's agent?

Comment, *Service Stations Torts: Time for the Oil Companies to Assume Their Share of the Responsibility,* 10 Cal.W.L.Rev. 382, 394–95 (1974). Comment *a* to § 267 of the *Restatement (Second) of Agency* discusses the third requirement:

> The mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct.

We shall assume, without deciding, that summary judgment could not properly have been entered on the questions of whether the plaintiffs subjectively entertained the belief that Weeks was an employee of Chevron U.S.A., and whether Weeks was engaged by the plaintiffs to make the repairs as a result of that belief. We hold, however, that summary judgment was correctly entered in favor of Chevron U.S.A. on the ground that any belief so held by the plaintiffs was not objectively reasonable under all of the circumstances.

Most of the alleged indicia of control relied on by these plaintiffs were identical to those relied on by the plaintiff in *B.P. Oil Corp. v. Mabe,* supra. The Lesches related by affidavit that:

The station was known as Walker's Chevron, Inc. There was a large sign bearing the Chevron logo which was located on the parking lot of the station. The gasoline pumps had Chevron decals. The service vehicles had Chevron decals on each door. There was a Chevron emblem and slogan on the door to the service bay. There were other Chevron decals on the poles supporting the canopy over the full service island, as well as on the office desk. The gas station employees wore uniforms with Chevron emblems on them, and the gas station service tickets had the Chevron emblem on them. There was no indication at the service station that it was not associated with Chevron in any respect.

\* \* \*

Also, Walker's Chevron identified itself as a Chevron service station in the local yellow pages.

From this, the Lesches said "it was evident to us that Walker's Chevron was associated with Chevron, a national oil company," and they thought that Chevron U.S.A. "would stand behind any repair."

In *B.P. Oil Corp. v. Mabe, supra,* 279 Md. at 640, 370 A.2d 554, we quoted the following passage from *Coe v. Esau,* 377 P.2d 815, 818 (Okla.1963):

It is indeed a matter of common knowledge and practice that distinctive colors and trademark signs are displayed at gasoline stations by independent dealers of petroleum product suppliers. These signs and emblems represent no more than notice to the motorist that a given company's products are being marketed at the station.

We also quoted from *Reynolds v. Skelly Oil Co.,* 227 Iowa 163, 171, 287 N.W. 823, 827 (1939), as follows:

The argument of appellee that the Skelly Oil Company was estopped because of the signs displayed and that, because of such signs, there was a presumption that the station was owned by the Skelly Oil Company has no support in reason or authority. [One may a]s well argue, that because the word 'Chevrolet' or 'Buick' is displayed in front of a place of business, General Motors would be

estopped to claim that it was not the owner of the business. It is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers.

This "common knowledge" line of reasoning has been followed by many courts throughout the country. *See, e.g.,* *Watkins v. Mobil Oil Corp.,* 291 S.C. 62, 352 S.E.2d 284, 287 (1986) (sale of Mobil products, presence of Mobil signs and emblems on uniforms, and station trading as "North Main Mobil" was not sufficient evidence to establish apparent agency); *Wood v. Shell Oil Co.,* 495 So.2d 1034, 1039 (Ala.1986) (presence of oil company's distinctive logo displayed on signs, literature, products, and uniforms is not sufficient evidence, in itself, to establish apparent agency because it is "common knowledge among the general public that such a logo is often displayed by independent dealers and that the only representation made by such displays is that the oil company's gasoline is sold at the service station"); *Stephens v. Yahama Motor Co., Ltd.,* 627 P.2d 439, 442 (Okl.1981) (display of two Conoco signs at service station not sufficient to establish apparent agency because it is common knowledge that such signs are displayed by independent dealers); *Apple v. Standard Oil, Division of American Oil Company,* 307 F.Supp. 107, 115 (N.D.Cal. 1969) (mere fact that service station sold Amoco gasoline and displayed Amoco signs did not constitute a "holding out" sufficient to give rise to a finding of apparent agency).

In *Mehlman v. Powell, supra,* 281 Md. at 274, 378 A.2d 1121, Judge Eldridge made this cogent observation for the Court:

[I]n *B.P. Oil Corp. v. Mabe, supra,* it was necessary to distinguish between the products offered for sale and the automotive services provided by the attendant. The mere fact that BP *products* are advertised for sale does not, in itself, justify the inference that BP is as well directly providing automotive *services.* (emphasis in original).

A similar distinction was drawn by the District Court of Appeal of Florida in *Cawthon v. Phillips Petroleum Company*, 124 So.2d 517, 521 (Fla.App.1960). *See also Sydenham v. Santiago*, 392 So.2d 357 (Fla.App.1981); *Ortega v. General Motors Corp.*, 392 So.2d 40 (Fla.App.1980). *Compare Orlando Executive Park, Inc. v. Robbins*, 433 So.2d 491, 493–94 (Fla.1983) (distinguishing "oil company cases" from other apparent agency situations).

The Lesches, however, point to additional factors that they believe militate in favor of a finding of apparent agency. First, they note that Chevron U.S.A. allowed them to charge their purchases of products and repairs on a VISA credit card.[5] We do not view that fact as an indication that Chevron U.S.A. controlled the details of the operation of Walker's Chevron. It is common knowledge that major oil companies accept credit card purchases, not only of their products, but of virtually anything sold by a service station, which, at least of fairly recent date, may even include grocery as well as automotive items. Moreover, it is common knowledge that many gasoline service stations accept several different major oil company credit cards. Whatever reasonable conclusions one might legitimately draw from the widespread use of credit cards in today's society, we are not convinced that there may be numbered among them the conviction that the party furnishing the credit card slip and cooperating with the credit card company and issuing bank enjoys the control of an employer over those whose bill is paid by the charge.

Additionally, the Lesches claim that Chevron U.S.A., although expressing concern in its internal communications about the use by independent dealers of the word "Chevron" in corporate names, failed to require Walker's Chevron, Inc. to change its name. We believe Chevron U.S.A.'s

---

5. The Lesches signed credit card slips that bore the name "Chevron U.S.A., Inc.", and the Chevron hallmark. They were billed by, and made payments to, First Omni Bank, through which their VISA card was issued.

principal concern was with the mandate of federal law [6] that it continually monitor the use of, and protect, its hallmark, at the risk of losing it. We do not believe that the inclusion of the word "Chevron" in the corporate name of Walker's Chevron to be a significant factor in favor of the plaintiffs' claim of a reasonable belief that Chevron U.S.A. was the master of the employees of this station. The station had been known as "Walker's Chevron" long before the decision to incorporate had been made.

The plaintiffs next advance an argument that, given slightly altered circumstances, might have proven persuasive. The argument deals with a campaign designed to encourage Chevron customers to utilize the service facilities of their dealers in addition to purchasing Chevron products. It is in the area of advertising that some courts have found that major oil companies, already perilously close to broad liability by reason of what appears to be rather than what really is, have occasionally gone over the precipice. *See, e.g., Gizzi v. Texaco Inc.,* 437 F.2d 308 (3rd Cir.1971) (national advertising slogan "You can trust your car to the man who wears the star" in addition to usual indicia of branded station); *Chevron Oil Company v. Sutton,* 85 N.M. 679, 515 P.2d 1283 (1973) (Chevron advertised in telephone directory that its repairmen were skillful).

The advertising program involved in the case before us was Chevron U.S.A.'s "We Care" program. Initiated in 1976, it provided to station owners, at a modest cost, a package of materials for display and distribution. Known as a "point-of-sale" program, it was apparently not accompanied by any national or local media advertising. Central to the "We Care" program was a dealer-customer pledge, framed for posting in the station, which read as follows:

---

**6.** *See Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1327 (7th Cir.1979), discussing the requirements of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

WE CARE ...

—for you, our customer
—for your comfort
—for your safety
—for your economy!

If at any time our service slips,
remind us, because we're
working hard to prove to you ...

WE CARE!

This station is dedicated to
this attitude and we want
to take care of your car for you,
properly and efficiently,
so you are happy, safe and
comfortable! Give us a try or
tell us when we miss the mark, so
we can keep up our promise ...

WE CARE!

The package also contained a two foot by three foot double-faced pump island sign, designed to contain a series of point-of-sale messages during the year; a large, double-faced pole sign; window signs; pressure sensitive decals; cards and "We Care" pens for distribution to customers; and, a Chevron car care guide.

It is a fair inference that Walker's Chevron participated in this program, but the record does not indicate the extent of its participation. Nine years later, when this incident occurred, the only visible remnants of the program were decals bearing only the words "We Care" and the Chevron hallmark. These were located on the poles supporting the canopy over the service island, on the desk in the office, and on a service bay door. There is no suggestion in this record that Dr. Lesch or his wife ever saw any of the "We Care" promotional materials except the decals, or that these de-

cals conveyed a message to them different in kind from that generally conveyed by the other Chevron insignia prominently displayed throughout the station. In short, the presence of the "We Care" decals under the particular circumstances present here does nothing to bolster the case of reasonable reliance.

Dr. Lesch also sought to prove his reasonable reliance on the involvement of Chevron U.S.A. with Walker's Chevron by referring to a conversation he had in 1980 or 1981 with Benny Walker, son of Ben Walker. At the time of this conversation, Ben Walker had died, and his son had become an owner of the business.[7] Dr. Lesch said that he had always had the greatest respect for the integrity and mechanical ability of Ben Walker. He knew, however, that Benny Walker did not have his father's mechanical ability. For this reason, and because he was experiencing some difficulties with a vehicle that Weeks was working on for him, he inquired of Benny Walker concerning Weeks's experience and ability. He related the conversation as follows:

A. Mr. Lloyd Creighton, one of the owners, mentioned to me when I inquired as to—it must have been shortly after Mr. Walker passed away, and I had my son's old '67 Valiant out to Walker's to have some engine problems, that we took it back once or twice, and Mr. Weeks was working on it, and there were some problems that kept recurring. And I asked Mr. Creighton, I said, not knowing that much about Mr. Weeks at the time, and having to adjust to new mechanics, after having years of faith in Mr. Walker, I had mentioned, questioning his ability, is he a good mechanic, or does he know what he's doing. And his answer was, oh, yes, he is sent to courses or he goes to courses. And by this I assumed or believed that this was a strong implication that he did indeed attend re-

---

7. Ben Walker died in 1980. His wife and son incorporated the business that year, and conveyed an ownership interest to Lloyd Creighton, who was also a manager at the station.

fresher courses or modernization courses, whatever, that were perhaps given by a national organization, most likely the one his gas station was affiliated with by its logo.

Q. Did he tell you which organization he went to these courses?

A. No. He said, oh, yes, he's a good mechanic, he regularly is sent to, or has to go to, not as if it was his own volition, as if it was a requirement.

So, I felt much more secure at that point in time, knowing that there were requirements or standards to be met by the employees.

Dr. Lesch said that he inferred from that conversation that Walker's Chevron was "being backed up by the major concern of Chevron." The conversation does not support the inference. There was nothing in the answer given by Creighton that involved Chevron.[8] Moreover, if Dr. Lesch was misled, it was not by any representation of Chevron U.S.A., and it is the manifestations of the party to be charged that are significant in this analysis. *See Restatement (Second) of Agency, supra* at § 267; Note, *Theories of Liability for Retail Franchisors: A Theme in Four Variations,* 39 Md.L.Rev. 264, 280 (1979).

In assessing the reasonableness of any reliance claimed by the Lesches, we also consider the history of the Lesches' dealings with the Walkers. Dr. Lesch began dealing with Ben Walker in 1959, when Walker owned the Sinclair branded service station business on Rock Spring Road. As noted above, Dr. Lesch held in high regard Ben Walker's mechanical ability and personal integrity. As a result, with the exception of warranty work on new vehicles, he had all of

---

**8.** The record discloses that Weeks had approximately 23 years experience as a mechanic. He had attended schools given by Citgo and Mercedes–Benz, as well as seminars given by various product suppliers. He was certified in various mechanical specialities by the National Institute of Automotive Service Excellence. He had never attended a school given by Chevron, nor was he aware of any such schools.

his automobiles serviced exclusively at Ben Walker's station. When Ben Walker moved his business to the Conowingo Road station, Dr. Lesch followed him. When Ben Walker changed from the Sinclair station to a BP station, and later from a BP station to a Chevron station, Dr. Lesch stayed with him. Dr. Lesch knew that Ben Walker owned the business at that time and recognized also that Chevron did not employ Ben Walker. In describing the time of the transition from BP to Chevron, Dr. Lesch testified:

> When his British Petroleum station became a part of the Chevron system. Or Chevron was the one who, *I can't say employed him,* but was the organizational head, or his supplier of gasoline and gasoline-related products. (emphasis added).

After Ben Walker's death in 1980, Dr. Lesch knew that the business continued to be privately owned.[9] He described Lloyd Creighton as "a part owner of the station."

The national product branding that existed at Walker's Chevron in 1985 differed very little from that which we found to exist in *B.P. Oil Corp. v. Mabe, supra.* Here, as there, we conclude that the reasonable inference that may be drawn from such indicia is that products of the featured national oil producer are sold at that station. The problem presented by a factual situation of this kind was well stated in an article dealing with vicarious liability appearing in the Yale Law Journal:

> The negligent repair cases pose somewhat more difficult issues. Certainly, the mere display of brand-name petroleum products hardly constitutes a representation about the skill of an auto mechanic. It may, however,

---

**9.** Because the record clearly demonstrates that Dr. Lesch was aware that Walker Chevron was privately owned and operated, we need not consider Chevron U.S.A.'s argument that because all persons are presumed to know the law, and because Maryland law prohibits operation of a retail service station by a producer or refiner of petroleum products, Maryland Code (1957, 1988 Repl.Vol.) Art. 56, § 157E, all consumers must be charged with knowledge that Chevron did not operate the station.

lead a few customers to believe that the financial resources of the oil company are available to satisfy the judgment in the event of faulty repairs, or even that the mechanic has received some training from the oil company.

Whether such beliefs are reasonable, however, is another question. Just as it is inefficient to allow sellers to deceive buyers, it is in general inefficient to impose liability on sellers for illogical or unreasonable beliefs of buyers. To do so would impose costs on sellers that are attributable to buyers' unpredicable idiosyncrasies, and would thereby lead to higher prices and to a smaller scale of operation with no attendant loss-avoidance benefits. Thus, the requirement of reasonable or justifiable reliance in the apparent authority rule is efficient, and it is certainly questionable whether the mere display of brand name logos and products at a service station constitutes a reasonable basis for any specific customer beliefs about the skill or financial status of the enterprise and its employees. (footnote omitted).

A. Sykes, *The Economics of Vicarious Liability*, 93 Yale L.J. 1231, 1277 (1984). It was not reasonable for the Lesches to conclude that Chevron owned or operated the station, or that it so controlled the employees of the station so as to be considered their master, and therefore responsible for their negligence. The facts of this case, viewed in light most favorable to the plaintiffs, do not support the imposition of vicarious liability against Chevron U.S.A.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.