## Kitchin v. Farber

*David G. Klaber,* for plaintiff
*William K. Herrington,* for defendant.

SILVESTRI, *J.,* February 6 1981—On October 2, 1976, Travis Camp Kitchin sustained injuries and his wife Helen died as the result of a collision of their vehicle with the vehicle of Kenneth W. Farber. The accident occurred on Interstate 80; the Kitchins were eastbound and Farber was westbound; Farber's vehicle crossed over into the eastbound lane colliding with the Kitchin vehicle.[1]

The Kitchins claim, inter alia, as herein relevant, that the Farber vehicle crossed into their lane of traffic because the left rear control arm of the car broke; that on September 18, 1976, two weeks before the collision, Farber's vehicle was inspected at the service station of Ernest Buterbaugh, who passed the vehicle despite the existence of a dangerously corroded control arm which was not properly corrected and should have been replaced.

The Kitchins further claim that Buterbaugh was the agent servant and/or employe of Texaco, Inc., which Texaco has denied. Upon completion of the pleadings, Texaco filed a motion for summary judgment pursuant to Pa.R.C.P. 1035 relying upon the depositions and interrogatories of record; Kitchin has filed an affidavit which sets forth the radio advertisements of Texaco during 1974 and 1975.[2]

Plaintiffs directed interrogatories to Texaco which were answered and the answers, as herein relevant, are set forth below.

---

1. At the time of and at the scene of the accident the westbound lanes of I-80 were under construction and westbound traffic was detoured onto the eastbound lanes so that the eastbound lanes were being used for both east and westbound traffic.

2. See Appendix A for full text of radio advertisements.

Texaco does have some retail outlets who have a contractual relationship with it which imposes certain obligations upon the retailer relative to the use of the Texaco name, logo or mark; there are other service stations who obtain Texaco products from a wholesaling intermediary and Texaco obligates its wholesalers to sell the products purchased from Texaco under Texaco brand names (interrogatory 1). Buterbaugh's service station was not selected by Texaco to use the Texaco name or logo, but he did sell certain Texaco products which apparently were obtained from Bi-Rite Oil Company (interrogatory 2). There were no agreements or understandings between Texaco and Buterbaugh relative to the use by Buterbaugh of Texaco's name or any logo or mark (interrogatory 5). As there was no contractual relationship between Texaco and Buterbaugh, Texaco did not police or inspect Buterbaugh's service station (interrogatory 7). Penn Glenn Oil Company, with whom Texaco has a distributor agreement for Texaco products, has a supply arrangement for Texaco products with Bi-Rite Oil Company and Bi-Rite supplies Buterbaugh with Texaco products (interrogatory 12). No persons in the employ of Texaco sold or distributed Texaco products to Buterbaugh during the period of time relative to the events in the complaint (interrogatory 13). Texaco did no advertising either in the Pittsburgh area or nationally of its name, logos or marks in connection with the repair and/or inspection of motor vehicles (interrogatories 14 and 17).

Ernest Buterbaugh's deposition was taken on March 21, 1978, and as herein relevant, establishes the following.

Buterbaugh owns a service station and garage at 1031 Perry Highway which is also a Pennsylvania State inspection station. Buterbaugh acquired the property in 1970 at which time he began selling

Texaco products. Prior to 1970, it was Citgo and then Fleet Wing station (Transcript 4, 5). Buterbaugh stocks and sells product other than Texaco products, e.g. Kendall Oil, Quaker State Oil, Goodyear tires, generator and repair parts (Transcript 6); the service station and garage is one business (Transcript 7) and he inspects only automobiles and light trucks (Transcript 8). On September 18, 1976, Butterbaugh inspected the vehicle of Kenneth Farber (Transcript 8); he did not inspect Farber's vehicle at any time prior to September 18, 1976 (Transcript 9, 15). Buterbaugh has a "big light" Texaco sign at the end of the building, on a pole about 20 feet high, and a Texaco sign above the entrance door (Transcript 16, 18) and on the "pumps" (Transcript 51). There are no other Texaco signs (Transcript 18). The Texaco signs were put up by Bi-Rite Oil Company, who is Buterbaugh's distributor out of Monroeville and is independent of Texaco; the signs were provided by By-Rite free of charge (Transcript 18). In addition to performing a state inspection on Farber's vehicle, Buterbaugh greased the vehicle and changed the oil and filter (Transcript 19). In the course of the State inspection, Buterbaugh did inspect the right rear control arm (Transcript 22). Buterbaugh is not employed by Texaco (Transcript 29) nor does he honor any "specials" which Texaco may promote since he is an independent dealer and not affiliated with Texaco. Texaco representatives never call on him (Transcript 30). Texaco never inspected Buterbaugh's facilities, nor did they even ask to do so; nor have they been on his premises (Transcript 36, 37), nor has he ever had any correspondence with Texaco (Transcript 38); Buterbaugh has never done any business in connection with Texaco except through Bi-Rite (Transcript 39); Buterbaugh is not

listed in the phone book under Texaco stations (Transcript 40). Texaco has never asked Buterbaugh to become an official inspection station (Transcript 49). The (Texaco) gasoline and oil products which Buterbaugh purchases from Bi-Rite are for resale at prices that he establishes (Transcript 64). The state inspection permit is issued in Buterbaugh's name; Texaco has no say whatsoever in the operation of the inspection station or inspection activities nor does it receive any proceeds therefrom (Transcript 64, 65, 66). Buterbaugh did not use any forms in his business that had the name Texaco on them (Transcript 73), although he did honor Texaco credit cards (Transcript 73, 74). Buterbaugh had no advertising arrangements with Texaco (Transcript 75). Texaco was not aware that Buterbaugh was performing state inspections and repairs on motor vehicles during the period of time relevant to the events in the complaint (interrogatory 4). Texaco has never suggested nor has Buterbaugh requested of them any help relative to tools or equipment to be used in the inspection of vehicles (Transcript 78, 79).

· The deposition of Kenneth W. Farber was taken on September 4, 1979 and, as herein relevant, establishes the following.

Farber was the owner and operator of a 1976 Pontiac automobile which was involved in the accident with the Kitchins on October 2, 1976 (Transcript 7). He never went to any one particular place to have his car inspected; he usually went to a gas station to have it inspected and serviced but never dealt with any place steadily (Transcript 13). Farber had his vehicle inspected a year, year and a half before at an Amoco station on Perrysville Avenue near where he lived, which was a "handy" place to take it (Transcript 15). It was inspected

again at the same Amoco afterwards and, "There was one that the gas station ain't even there any more (Phillips 66 on Babcock Boulevard) and Butterbaugh's was the last one." (Transcript 24, 58). Farber went to Buterbaugh's for an oil change and a grease job because he was getting ready to go deer hunting, ". . . and while I was there, he wasn't busy and I asked him to inspect it. I said, 'Do you have time to inspect it?' and he said, 'Yes,' I usually don't deal with them either. I know them. The(y) work trucks, but I never knew him or anything." (Transcript 25). Farber's employer takes his trucks to Buterbaugh for gas (Transcript 60); Farber further testified as follows:

*By Mr. Kirshner:*

Q. Was the purpose in going to Butterbaugh's station to get a lube job and an oil change? What was the original purpose in going to Butterbaugh's with your car?

A. Well, that Saturday morning I didn't really start out really to do too much at all with my car. I was supposed to go and do some work some place and it cancelled out.

Q. Work for your employer?

A. No; for myself. And at the time I had to come back that way. I just pulled in. It wasn't busy. I pulled in, and that was just about it. I just figured I might as well get it done while I'm here. The inspection didn't really roll through my head until I figured, you know, kill two birds with one stone while I was there, you know.

Q. You had some work originally scheduled, personal work?

A. Right.

Q. And that got cancelled?

A. Right. I was up early and there was nobody out. Usually I'm not up that early on Saturdays,

unless I'm working, and that got cancelled out, and I figured I'd take care of that while I was going.

Q. When you say, "take care of that," you mean that lube and oil change.

A. That's right. That's what I mean we started out to do.

Q. When you started out, did you have any particular station in mind?

A. No, I was just passing it. That's all.

Q. You just happened to pass it and he wasn't busy?

A. Right.

Q. So that the real inducement to go into that particular shop was that he wasn't busy?

A. Right. I just happened to be right out in Perrysville, and because usually you go and they get busy. They say, "You got to wait, do this, do that." So I pulled in, and he said he could take me.

Q. When he said he could take you, specifically it was to do what? Grease and change the oil?

A. Yes.

Q. And nothing else?

A. Right.

Q. Then do I understand that as long as you were having the car lubricated and it was up on a rack, you decided, "Well, I might as well get it inspected also"?

A. Yes. That plus a lot of places want ahead of time, they want to know. I just asked him. I didn't know that he was really going to take it because they say, "Oh, no. I got somebody coming in at so and so."

I said, "Is there any chance that you can inspect it while I'm here?" and he said, "Yes."

Q. So again the inducement for having it done there and then was the convenience of time?

A. Right.

Q. Was there any particular advertisement that

this station had put out that induced you to have it inspected there?

A. No.

Q. There was nothing about that station that called to your attention the quality of work it did. Am I correct in that?

A. Oh, no. Yes, I know what you mean there. No. He's a pretty good gas station that I know of; established.

Q. Do you know what kind of gas station it is?

A. Texaco, I think.

Q. Was the fact that it was a Texaco station of any inducement to you to go in there?

A. No. As I say, I put any kind of gas in, I go to any station. Just convenience.

Rule 1035(b) relating to summary judgment states: "The judgment sought shall be rendered if pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In determining whether or not a genuine issue as to any material fact exists, "'. . . the court must take that view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences that might reasonably be drawn from the evidence. . . .'" Moore v. Zimmerman, 221 Pa. Superior Ct. 359, 360, 292 A. 2d 458, 459 (1972). A judgment ". . . is to be entered only in the clearest of cases where there is not the slightest doubt as to the absence of a triable issue of material fact." Granthum v. Textile Machine Works, 230 Pa. Superior Ct. 199, 201, 326 A. 2d 449, 451 (1974).

Plaintiffs have made two arguments in opposition to Texaco's motion for summary judgment:

(1) that the court should deny the motion because discovery has not been completed, and (2) that a jury should be allowed to decide whether Texaco held itself out as the apparent principal of Buterbaugh to Buterbaugh's customers through radio advertising.

In support of their first argument, plaintiffs contend that factual allegations concerning the existence of a contractual relationship between Buterbaugh and Texaco must be proved or disproved through further discovery proceedings and without such that it would be inappropriate to grant summary judgment. The Pennsylvania Rules of Procedure, however, do not require that discovery be completed before the court can enter summary judgment. Rule 1035(a) states that "[a]fter the pleadings are closed . . . any party may move for summary judgment,"[3] as was done here. As noted above, Buterbaugh's deposition testimony, as well as Texaco's answers to plaintiffs' interrogatories, asserted repeatedly that Buterbaugh had not entered into a contractual arrangment with Texaco. It is readily apparent from a reading of the deposition as a whole, and the pages of the transcript cited above in particular, that neither an oral nor a written contract can be found to exist.

The liability of a principal to third parties for the act of an agent must rest on (1) express authority,

---

3. Once a motion for summary judgment has been presented to the court at the close of the pleadings, the proper procedure would be to request the court to continue the argument on the motion and request leave to continue discovery proceedings. In any event, we are satisfied that plaintiffs have had more than sufficient time to discover the essential information to support their position inasmuch as Texaco was joined as a defendant in September of 1977 and answered interrogatories on May 31, 1978, and Buterbaugh's deposition was taken on March 21, 1978.

(2) implied authority, (3) apparent authority, as where the principal holds one out as an agent by words or conduct, or (4) agency by estoppel: Passarelli v. Shields, 191 Pa. Superior Ct. 194, 156 A. 2d 343 (1959). It is clear that there is no agency or master-servant relationship, express or implied, between Texaco and Buterbaugh. It is the concept of apparent authority upon which plaintiffs seek to establish Texaco's liability and so we proceed to consider whether or not there is a genuine issue of Texaco holding itself out as the apparent principal of Buterbaugh through the use of radio advertising.

To establish apparent authority, the following elements must be present: (1) manifestations by the alleged principal to a third person which tend to indicate the existence of an agency relationship, and (2) a reasonable belief by the third person that the alleged agent is authorized to bind the principal. In order for the third person to recover against the principal, he must have *relied* on the manifestations of authority by the alleged principal ". . . and such reliance must have been reasonable under the circumstances." Gizzi v. Texaco, Inc., 437 F. 2d 308, 309 (3d Cir. 1971) cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed. 2d 57 (1971). The burden of establishing an agency relationship rests on the party asserting it: Girard Trust Bank v. Sweeney, 426 Pa. 324, 231 A. 2d 407 (1967).

Plaintiffs rely in part upon the Restatement, 2d, Agency, §267, which provides: "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." It was recognized in Drexel v. Union Pre-

scription Centers, Inc., 582 F. 2d 781 (3d Cir., 1978), that the applicability of section 267 to Pennsylvania agency law was in question and the Pennsylvania courts had not dealt with the issue of liability of an ostensible principal for the negligence of an ostensible agent. The court in Drexel, following the reasoning of the court in Taylor v. Costa Lines, Inc., 441 F.Supp. 783 (E.D. Pa. 1977), in adopting section 267, stated the ". . . Pennsylvania courts have long utilized the closely related doctrines of 'apparent authority' and 'agency by estoppel' in cases dealing with contractual liability and have approved the Restatement formulations of those theories" and applied the concept of section 267 to a cause of action grounded on a negligence theory. Similarly, plaintiffs' cause of action in the case at bar is based on a negligence theory and section 267 will be applicable.

In Gizzi, a personal injury action was instituted by plaintiff against Texaco, Inc. for injuries sustained when his car brakes failed to function subsequent to the repair of the brakes by a service station operator who had sold the car to plaintiff. The operator handled Texaco's products and Texaco was the sole defendant named in plaintiff's complaint. The theory of liability upon which plaintiff based his cause of action against Texaco was that Texaco had clothed the operator with apparent authority to make the repairs and sale of the vehicle on its behalf and plaintiff had reasonably assumed Texaco would be responsible for any defects.

Plaintiff Gizzi introduced evidence of Texaco's national advertising, testifying that he was *aware* of the advertising and that it had instilled in him confidence in Texaco and its products as well as evidence of Texaco dealer's involvement in the sale of cars and Texaco's awareness of the same, evi-

dence that Texaco had a regional office located directly opposite the service station in question and evidence that Texaco insignia and slogans were prominently displayed. In light of the evidence presented, the court held that the issue should have been determined by a jury; however, the court noted that ". . . the evidence on behalf of [the plaintiff] by no means amounted to an overwhelming case of liability." Gizzi, supra, at 310.

The evidence presented by plaintiffs in the instant case is less convincing yet. Plaintiffs' attempt to demonstrate the apparent authority manifested by Texaco solely on the strength of the evidence of radio advertising and signs. Plaintiffs have not introduced any evidence showing that Farber had even *heard* the advertising much less evidence demonstrating Farber was motivated by a sense of confidence in Texaco's products or services. Texaco's answer to plaintiff's Interrogatory 4 stated Texaco was not aware that Buterbaugh was performing state inspections. Also, as noted above, in his deposition Farber specifically stated he was not enticed to enter Buterbaugh's station by Texaco's reputation or any advertising by Buterbaugh. Farber's testimony indicated he was not inspired by Texaco jingles but rather by the convenience of the location and no doubt by the novelty in these times of a "yes" answer to his inquiry of Buterbaugh as to whether the car could be inspected while he was there. There is no part of Farber's testimony which could be construed to establish his reliance on "the indicia of authority originated by the principal," i.e., Texaco's advertisements, as required to sustain a claim against Texaco. Plaintiffs cannot overcome a basic deficiency in their case against Texaco since they have not been able to establish the crucial element of reliance.

Although *express* reliance by Farber cannot be established plaintiffs attempt to satisfy the requirements of reliance, albeit unsuccessfully, by contending that Farber was induced to seek Buterbaugh's service because of Texaco's promotion of its products. Plaintiffs argue the assertion of a lack of reliance cannot establish as a matter of law that a representation did not in fact induce a consumer to use a particular product or service. There is no case law in Pennsylvania which has dealt with the issue of whether "unconscious" reliance engendered by extensive advertising would be sufficient to satisfy the element of reliance necessary to sustain plaintiffs' cause of action. Plaintiffs urge the court to adopt the reasoning of the Supreme Court of California in Stevens v. Parke, Davis & Company, 9 Cal. 3d 51, 107 Cal. Rptr. 45, 507 P. 2d 653 (1973), in reversing an order granting a new trial and holding that evidence in the record together with reasonable inferences could support an implied finding of a jury that Parke, Davis, a drug manufacturer, was negligent in overpromoting a drug so that members of the medical profession, including a defendant doctor, were caused to prescribe it when it was not justified and that such negligence would sustain Parke, Davis' liability in an action for wrongful death.

In Stevens, an action for wrongful death had been instituted by the family of decedent Mrs. Stevens. Mrs. Stevens, suffering from a lung condition, had undergone surgery and subsequently her doctor prescribed an antibiotic manufactured by Parke, Davis under the trade name of Chloromycetin. After several administrations of Chloromycetin Stevens was diagnosed as suffering from a bone marrow condition which later contributed to the cause of her death. Testimony during the trial indi-

cated that Chloromycetin had caused the condition.

Earlier, the United States Food and Drug Administration had initiated an investigation which established that blood disorders could be associated with the use of Chloromycetin and directed Parke, Davis to include warnings of such on each label of the drug. Despite its awareness of the drug's side effects, Parke, Davis continued to promote Chloromycetin in a fashion which minimized the drug's dangers. The promotion included *personal* visits to doctors by salesmen urging them to use the drug, during which no verbal warnings were given, distribution of paraphernalia carrying the name Chlolomycetin, and advertisements in medical journals without reference to any side effects. In holding that the evidence in the record supported the implied finding of they jury that Parke, Davis overpromoted Chloromycetin and that it was ". . . reasonble to assume that the company's efforts consciously or subconsciously influenced [the doctor]" p. 67, despite the doctor's testimony that he was cognizant of the dangers involved, the court emphasized the importance of the numerous personal visits to physicians and the testimony by defendant doctor ". . . that he [himself had] received visits by . . . salesmen and that he read the journals which contained advertisements concerning [the drug]." Stevens, supra, 68.

It is this emphasis of the California court on the concerted effort of Parke, Davis in its advertising and its encouragement of sales personnel to initiate personal contact with the physicians which leads this court to hold that the evidence of Texaco's radio advertising without more is insufficient to establish the element of reliance by Farber which is vital to sustain a claim of apparent authority. Again,

there is no evidence on the record that Farber had heard the radio advertisements and the circumstances surrounding Farber's choice of Buterbaugh's service station, as noted above, do not support plaintiffs' argument that Farber was subconsciously influenced by the advertisements.

It must be remembered that plaintiffs have attempted to create the appearance of an agency relationship between Texaco and Buterbaugh based on alleged manifestations to Farber and that it is Farber's reliance which plaintiffs have attempted to show. Assuming, arguendo, evidence of Farber's reliance could be demonstrated, such reliance would not be imputed to plaintiffs who had no dealings with the alleged apparent agent. The Restatement, 2d, Agency, §8, states: "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations *to such third persons.*" (Emphasis supplied.) A review of the Pennsylvania cases dealing with the issue of apparent authority indicates the principle stated in section 8 is to be applied in situations where the third person to whom the manifestations of authority were made is also the person who suffered the injury on which the cause of action is based.[4]

---

4. See Drexel v. Union Prescription Centers, Inc., 582 F. 2d 781 (3d Cir. 1978); Gizzi v. Texaco, Inc., 437 F. 2d 308 (3d Cir. 1971), cert. denied, 404 U.S. 829 (1971); Bowman v. Home Life Ins. Co. of America, 260 F. 2d 521 (3d Cir. 1958); Universal Computer Systems, Inc. v. Medical Services Ass'n. of Pennsylvania, 474 F. Supp. 472 (M.D. Pa. 1979); Capetola v. Orlando, 463 F. Supp. 498 (E.D. Pa. 1978); Taylor v. Costa Lines, 441 F. Supp. 783 (E.D. Pa. 1977); Apex Finan. Corp. v. Decker, 245 Pa. Superior Ct. 439, 369 A. 2d 483 (1976); Revere Press, Inc. v. Blumberg, 431 Pa. 370, 246 A. 2d 407 (1968).

Although there has not been a case in Pennsylvania explicitly dealing with the issue of whether there must be actual reliance upon the part of the person injured, careful examination of the cases considering the applicability of apparent authority construction leads this court to hold that reliance must be personal to the injured party.

Indeed, the Restatement, 2d, Agency, §8, Comment a, which states "apparent authority exists only with regard to *those who believe* and have reason to believe that there is authority . . ." (emphasis supplied) was cited with approval by the Third Circuit court in Bowman v. Home Life Insurance Company of America, 260 F. 2d 521, 23 (3d Cir. 1958).

In B.P. Oil Corporation v. Mabe, 279 Md. 632, 370 A. 2d 554 (1977), the Maryland Court of Appeals in a discussion of agency by estoppel and apparent agency held "that for there to be liability (in a case based on apparent authority or agency by estoppel) there must be actual reliance on the part of the person injured." The court premised that holding upon Restatement, 2d, Agency, review of case law, including Gizzi, supra, and a discussion of the matter in Mechem, Law of Agency. The court cited section 245 of Mechem's text which states, at p. 644, 370 A. 2d at 561:

"Estoppel is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, or that someone else was, so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough."

We find the reasoning of the Maryland court per-

suasive and accordingly we hold the element of reliance required to establish apparent authority must be reliance of the party injured. It is obvious that the plaintiffs did not and, under the circumstances, could not have relied on the appearance or conduct of Buterbaugh's service station vis-a-vis Texaco.

An appropriate order granting Texaco's motion for summary judgment shall be entered.

## APPENDIX A

### B&B RADIO
Benton & Bowles, Inc.,
909 Third Avenue, New York, N.Y. 10022/758-6200

Client: TEXACO, INC.
Product: TBA
Draft: 1-10-10-74 sf
AS RECORDED THURS. SEPT. 26, 1974
**1:00 RADIO COMMERCIAL TEX-2953—
"HAIL TEXACO"/TBA**

WOMEN: Hail to the men of Texaco; Men of the Texaco star.

MEN: We like to think at Texaco; We've got everything for your car.

ANNCR: You don't always know when you're going to need something replaced on your car. A broken wiper blade. A worn fan belt. Or a battery that refuses to turn the engine over. What you need to know is where to go to get help—your independent Texaco retailer. He carries a line of quality products you can count on.

ALL: That's why you can trust your car; To the man who wears the star; For the kind of products; That can take care of your car . . . At every Texaco Station; Clean across the nation; You can trust your car: To the man who wears the star.

Client: TEXACO, INC.
Product: GAS EFFICIENCY
Draft: 1-11-6-74 sf
AS RECORDED THURS. OCT. 31, 1974
**1:00 RADIO COMMERCIAL #TEX-2966—**
**"MAL DODDS II"**

SINGERS: All across the country; It's so good to know; you get products you can trust at Texaco.

'Cause no matter where you are: Trust the man who wears the star; The big, bright Texaco star.

ANNCR: Maybe your car is eating up gasoline and you don't know it. To find out, stop in and see one of the many independant Texaco Retailers in any one of our 50 states, and have him check it out—the points, plugs, carburetor. All those things that can help keep your car well tuned. Because if you are wasting gasoline, you're wasting money. And you ought to know about it.

SINGERS: For products you can trust; You can trust your car: To the man who wears the star. The big, bright Texaco star.

Client: TEXACO, INC.
Product: GASOLINE EFFICIENCY SERVICE
Draft: 1-10-10-74 sf
AS RECORDED THURS. SEPT. 26, 1974
**1:00 RADIO COMMERCIAL #TEX-2951—**
**"STAR MARCH"/GAS EFFICIENCY**

SINGERS: (Group) When you're out in a car; Trust is everthing; Be sure your car is up to par. Trust in everything and at Texaco; We've got everything for your car.

ANNCR: A car that's not tuned up regularly can eat up more gasoline that it should. To help you get the most out of every gallon . . . see your independent Texaco retailer for an engine tune-up—points, plugs, timing, the works. Checkups like this could

save you up to one gallon of gasoline for every ten you use. These days, that's a nice saving.

SINGERS: For products you can trust; You can trust your car: To the man who wears the star; The big, bright Texaco star!

Exhibit "C" of Affidavit

Client: TEXACO, INC.
Product: MARFAK LUBRICATION
Draft: 1-8-28-74 sf
LIVE
:30 LIVE RADIO COMMERCIAL #TEX-1057R—
LOCAL SPORTS 1974
ANNOUNCER: (LIVE)

Remember, friends, even in this age of the super-highway, the going's not *always* smooth. Once off the main roads, the going may be rough—with bumps, dirt, dust and water splashes. Things that are tough on your car's chassis. Why not give it the protection of Marfak Lubrication—at an independent Texaco Retailer? Doesn't take long . . . and it pays . . . in comfort and safety. Marfak is one of Texaco's most famous products—and another good reason to trust your car to the man who wears the Texaco star.

Client: TEXACO, INC.
Product: GAS EFFICIENCY
Draft: 1-11-6-74 sf
AS RECORDED THURS. OCT. 31, 1974
1:00 RADIO COMMERCIAL #TEX-2966—"MAL
DODDS II"

SINGERS: All across the country; It's so good to know; You get products you can trust at Texaco.

'Cause no matter where you are; Trust the man who wears the star; The big, bright Texaco star.

ANNCR: Maybe your car is eating up gasoline

and you don't know it. To find out, stop in and see one of the many independent Texaco Retailers in any one of our 50 states, and have him check it out—the ponts, plugs, carburetor. All those things can help keep your car well tuned. Because if you are wasting gasoline, you're wasting money. And you ought to know about it.

SINGERS: For products you can trust; You can trust your car; To the man who wears the star; The big, bright Texaco star.

Client: TEXACO, INC.
Product: GAS EFFICIENCY
Draft: 1-12-16-74 sf
LIVE
:30 LIVE RADIO COMMERCIAL #TEX-2979—
"MAL DODDS II"/GAS EFFICIENCY
ANNOUNCER: (LIVE)

Maybe your car is eating up gasoline and you don't even know it. Why not find out. Stop in and see one of the many independent Texaco retailers throughout the state. Ask him to check out your engine—the points, plugs, carburator . . . all those things that can help keep your car well tuned. Because if you are wasting gasoline, you're wasting money. And Texaco thinks you ought to know about it. Remember, for products you can trust, trust your car to Texaco.

## ORDER

And now, Feburary 6, 1981, after argument, consideration of the briefs of the parties and a review of the record, it is ordered that the motion of Texaco Inc. for summary judgment is granted.